**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DYSON, INC., an Illinois Corporation )
)
          Plaintiff, )
)
vs. )
)    No. 1:08-cv-02068
)
LINENS 'N THINGS, INC., a Delaware )
Corporation, )    Judge The Hon. Virginia M. Kendall
)
         Defendant. )
)
)

**LINENS 'N THINGS, INC.'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION TO DISMISS**

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 9(b) and 12(b), Linens 'n Things, Inc. moves to dismiss for failure to state a claim, failure to plead with particularity, failure to join a party, and for improper venue. In a desperate attempt to avoid its actual legal obligations, Plaintiff Dyson, Inc. ("Dyson") improperly brings suit under a terminated contract executed in 2003 ("Terminated Contract") to which Linens 'n Things, Inc. was not even a party. A Vendor Agreement for "Linens 'n Things" ("Vendor Agreement"), however, does exist between Linens 'n Things, Inc.'s wholly owned subsidiary, LNT Merchandising Company LLC ("LNT Merchandising"), and Dyson from 2006. Why did Dyson bring suit under the Terminated Contract instead of the Vendor Agreement? Dyson seeks to avoid the Vendor Agreement's explicit forum selection clause requiring that any litigation occur in New Jersey. The Terminated Contract conspicuously lacks such a provision.

The Court should dismiss this lawsuit because:

- Linens 'n Things, Inc. is not a party to the Vendor Agreement;

- LNT Merchandising is an indispensable party that Dyson failed to join; and

- the Vendor Agreement requires litigation to occur in New Jersey.

## II.    BACKGROUND FACTS

### A.    Who are Linens 'n Things, Inc., LNT Merchandising, and Dyson?

Linens 'n Things, Inc. is one of the leading, national large-format retailers of home textiles, house wares and decorative home accessories, currently operating over 500 stores in 47 states and six Canadian provinces. LNT Merchandising is a wholly owned subsidiary of Linens 'n Things, Inc. Dyson is a manufacturer and seller of vacuum cleaners. LNT Merchandising was a Dyson customer purchasing Dyson vacuum cleaners for subsequent sale at retail stores.

In 2003, Dyson and LNT Merchandising executed the Terminated Contract. [A true and correct copy of the Terminated Contract is attached and incorporated herein at Ex. A-1.][1] William Nadel ("Nadel"), LNT Merchandising's buyer of floor care products, i.e. vacuum cleaners, executed the Terminated Contract which consisted of a Dyson generated form. [Attached and incorporated herein by reference as Ex. A is the Declaration of William Nadel at ¶ 4.] The form did not indicate the parties to the contract so Nadel simply wrote "Linens 'n Things" beneath his signature. [*Id.*] "LINENS 'N THINGS", however, is a trademark—not a corporate entity.[2] LNT Merchandising *owns* the "LINENS 'N THINGS" trademark. In fact, payment to Dyson for the vacuum cleaners came on LNT Merchandising checks and not from

---

[1] A defendant may attach documents not part of the plaintiff's complaint as part of a motion to dismiss when the case involves the interpretation of a contract. *See 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (holding that district court's review of a form related to the contract at issue was appropriate because breach of contract was central to the plaintiff's claims); *see also Venture Assoc. v. Zenith Data Systems*, 987 F.2d 429, 431 (7th Cir. 1993) ("[A] defendant may introduce certain pertinent documents if the plaintiff failed to do so" as part of its complaint.).

[2] "LINENS 'n THINGS" is a registered trademark (U.S. Reg. No. 934171). *See* www.uspto.gov.

Linens 'n Things, Inc.   [Attached and incorporated herein by reference as Ex. B is the Declaration of James Rigoli at ¶¶ 3-5.][3]

In 2006, LNT Merchandising and Dyson executed the Vendor Agreement once again establishing LNT Merchandising as a purchaser of Dyson vacuum cleaners for sale at Linens 'n Things, Inc.'s retail stores.  [Ex. A at ¶ 12.]  This time LNT Merchandising, however, generated the document and, thus, its name prominently appears in the introduction and signature page.  [Ex. A-2 at pp. 2, 7.]  Nadel executed the Vendor Agreement on behalf of LNT Merchandising.  [*Id.* at p. 7.]  Tom Lawler ("Lawler"), Dyson's National Accounts Manager, signed it on behalf of Dyson.  [*Id.*]

The Vendor Agreement specifies that it governs the entire relationship between the parties as it includes LNT Merchandising and "its affiliates," "constitutes the entire agreement between the Parties," and "supersedes all prior agreements."  [*Id.* at pp. 2, 6.]  Further, the Vendor Agreement explicitly states that the "federal and state courts within the State of New Jersey shall have exclusive jurisdiction to adjudicate any dispute arising out of or related to this Vendor Agreement."  [Ex. A-2 at ¶ 16.]  Pursuant to the Vendor Agreement, Dyson continued to accept payment from LNT Merchandising in exchange for its vacuum cleaners.  [Ex. B at ¶¶ 3-5.]  In a desperate attempt to avoid its obligations under the Vendor Agreement, Dyson now brings suit against Linens 'n Things, Inc.—not LNT Merchandising—for breach of the Terminated Contract.

---

[3] *See* footnote 1.

## II.    ARGUMENT AND AUTHORITIES

**A.    The Vendor Agreement Governs This Dispute.**

*1.    The Terminated Contract  is not valid.*

A later contract between two parties containing the same subject matter supercedes the earlier contract. *See GCIU Employer Ret. Fund v. Chicago Tribune Co.*, 66 F.3d 862, 866 (7th Cir. 1995) (holding that when two contracts contain the same subject matter, consideration, and parties, the latter contract will supersede the former one); *Beverage Indus. Local No. 744 Health and Welfare Fund v. Quality Beers Ltd. P'ship*, 58 F. Supp. 910, 915 (N.D. Ill 1999) (finding that when contracts of the same subject contain conflicting terms, the latter contract supersedes the first).   Further, the presence of a "merger clause" in a contract is strong evidence of the parties intent that the writing be the complete and exclusive agreement between them. *Rosenblum v. Travelbus.com Ltd.*, 299 F.3d 657, 667 (7th Cir. 2002) ("A merger clause…assures the parties that their entire agreement is memorialized in the written contract, and permits either party to invoke the parol evidence rule to exclude evidence of additional terms not included in the written agreement).

Dyson and LNT Merchandising executed the Vendor Agreement in 2006—three years after the Terminated Contract.   Dyson and LNT Merchandising were parties to both contracts. [Ex. A at ¶ 4; Ex. A-2.]   The contracts also concern the sale and purchase of goods between Dyson and LNT Merchandising.   The Vendor Agreement establishes "Vendor [Dyson] as an approved non-exclusive supplier of merchandise" from whom "LNT [Merchandising] may from time to time…place orders for the purchase of merchandise with Vendor." [Ex. A-2 at ¶ 1.]   The Terminated Contract states it is a "Contract for the sales of Goods by the Seller [Dyson] to the Buyer." [Ex. A-1.]   Finally, the Vendor Agreement contains a merger clause.   "This Vendor

Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof and supercedes all prior agreements…between them as those agreements may relate to the subject matter of this Vendor Agreement." [Ex. A-2 at ¶ 19(a).] Assuming *arguendo* that Linens 'n Things, Inc. was a party to the Terminated Contract, it is still no longer valid due to the Vendor Agreement's inclusion of all of LNT Merchandising's "affiliates."[4] The Vendor Agreement is the only valid writing at issue.

> 2.    *Lawler had both actual and apparent authority to execute the Vendor Agreement on behalf of Dyson.*

An agent may bind his principal under the concepts of either actual or apparent authority. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) (citing *C.A.M. Affiliates, Inc. v. First American Title Ins. Co.*, 306 Ill. App. 3d 1015, 715 N.E.2d 778, 783 (1999)); *see also Moriarty v. Glueckert Funeral Homes, Inc.*, 967 F. Supp. 1038, 1048 (N.D. Ill. 1997) (holding that an employer that was a member in a union employee benefits trust fund gave its implied actual authority for the trust fund to enter into a collective bargaining agreement with the union). Actual authority may be either express or implied. *Moriarty*, 967 F. Supp. at 1048. "Implied actual authority is shown by circumstantial evidence that leads an ordinarily prudent person dealing with the agent to believe that the agent was acting on behalf of the principal." *Id.*

Under the doctrine of apparent authority, "'a principal will be bound…by the authority it appears to give.'" *Opp*, 231 F.3d at 1065 (quoting *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 719 N.E.2d 756, 765 (1999)). Apparent authority arises when "[t]he principal, having placed the agent in a situation where he may be presumed to have authority to act, is estopped as against a third person from denying the agent's apparent authority." *Bank of North Carolina v. Rock Island Bank*, 630 F.2d 1243, 1251 (7th Cir. 1980) (holding that a bank

---

[4] An affiliate is a corporation that is a "'subsidiary, parent or sibling'" of another corporation. *Chillmark*, 2003 WL 1964408, at *3.

president had the apparent authority to enter into a letter of credit with another bank). "This doctrine applies where the principal is a corporation, therefore, if a corporation…intentionally or negligently bestow on an officer the authority to act for it, in a particular capacity, and third parties deal in good faith with the officer, the corporation will be bound as if the apparent authority is real." *Redex, Inc. v. Melmark Cartage Co., Inc.*, No. 87 C 7101, 1989 WL 68480, at *1 (N.D. Ill. June 16, 1989) (holding that it was reasonable to assume that a general manager of a trucking company had the apparent authority to enter into a freight services contract). "Once a principal situates the agent in such a position that he may be presumed to have the authority to act, the principal 'is estopped as against a third person from denying the agent's apparent authority.'" *Id.* at *2 (quoting *Bank of North Carolina, N.A.*, 630 F.2d at 1251).

> a.      *Actual authority.*

Lawler's actions and the actions of his fellow Dyson employees gave rise to his implied actual authority for the execution of the Vendor Agreement. *Melmark*, 1989 WL 68480, at *2.

> i.      *Chicago Meetings.*

Lawler met with Nadel in person at Dyson's headquarters in Chicago ("Chicago Meetings"). [Ex. A at ¶ 10.] The Chicago Meetings took place about once a year from 2004 through late 2006. [*Id.*] Two of Lawler's superiors, Dave Bimschleger ("Bimschleger"), Dyson's Vice President of Sales and Doug Kellam ("Kellam"), Dyson's President, were present at some of the Chicago Meetings. [*Id.* at ¶ 8.] Even more significant was the attendance of James Dyson, the ***chief executive officer*** of Dyson's parent company and ***namesake*** of the Dyson corporate family at one of the Chicago Meetings. [*Id.* at ¶ 10.] Needless to say, Mr. Dyson was also Lawler's superior at Dyson. The presence of Dyson executives like Bimschleger, Kellam, and James Dyson himself at the Chicago Meetings left Nadel with the

impression that Lawler had the authority to negotiate and execute the Vendor Agreement on behalf of Dyson. [Ex. A at ¶ 14(d).]

ii.    <em>New Jersey Meetings.</em>

Lawler also met with Nadel in person at LNT Services' headquarters in Clifton, New Jersey ("New Jersey Meetings") about once a month from early 2004 through late 2006. [*Id.* at ¶ 11.] Bimschleger, Kellam, and Jeff Collins, Dyson's Vice President of Marketing, were at some of the New Jersey Meetings. [*Id.*] Bimschleger, Kellam, and Collins' presence at the New Jersey Meetings also gave Nadel the impression that Lawler had the authority to negotiate and execute the Vendor Agreement. [*Id.* at ¶ 14(e).]

ii.    <em>Lawler E-Mails.</em>

Lawler and Nadel also corresponded on e-mail several times a week from early 2004 though late 2006 ("Lawler E-Mails"). [Ex. A at ¶ 9.] Some of the Lawler E-Mails included Lawler's superiors, Bimschleger and Kellam, as well as another Dyson executive, Maria Tryan, Dyson's Chief Financial Officer. [*Id.* at ¶ 9.] Bimschleger, Kellam, and Tryan's inclusion on the Lawler E-Mails led Nadel to believe that Lawler had the authority to negotiate and execute the Vendor Agreement on Dyson's behalf. [*Id.* at ¶ 14(c).]

iii.    <em>Lawler Phone Calls.</em>

Lawler and Nadel spoke on the phone several times a week from early 2004 through late 2006 ("Lawler Phone Calls"). [Ex. A at ¶ 7.] Lawler indicated during some of the Lawler Phone Calls that he would have to confer with his superiors at Dyson prior to agreeing to something on Dyson's behalf. [*Id.*] These statements further gave Nadel the impression that he had the authority from Dyson to negotiate and execute the Vendor Agreement. [Ex. A at ¶ 14(b).]

     *b.    Apparent authority.*

Lawler's title created the apparent authority to execute the Vendor Agreement. *Redex*, 1989 WL 68480, at \*2. Lawler presented himself as the "National Account Manager" for Dyson, and other Dyson officers—including a vice president of sales (Bimschleger), a president of Dyson (Kellam), and the chief executive officer (Mr. Dyson) treated him as such. In Nadel's eight years of experience as a buyer of retail goods, "account managers" typically had the authority to enter into agreements with retailer customers on behalf of the product vendors employing them. [*Id.* at ¶ 6.] Just like the general manager in *Redex*, Lawler—Dyson National Account Manager—possessed the apparent authority to negotiate and execute the Vendor Agreement.

    *3.    Dyson ratified the Vendor Agreement.*

"Ratification occurs when a principal, with knowledge of the material facts of an unauthorized transaction, takes a position inconsistent with non-affirmation of the transaction, or retains the benefits of the unauthorized transaction." *Schulze and Burch Biscuit Co. v. Tree Top, Inc.*, No. 84 C 8397, 1985 WL 4099, at \* 3 (N.D. Ill. 1985) (holding that a principal ratified inclusion of an arbitration clause in a contract by not objecting to it and taking delivery of goods pursuant to the contract); *Hardin, Rodriguez & Bovin Anesthesiologists Ltd. v. Paradigm Ins. Co.*, 96 F.2d 628 (7th Cir. 1992) (holding that a principal ratifies a contract made by an agent when, with knowledge of all material facts, it fails to disaffirm the contract within a reasonable time and accepts benefits under it).

Dyson's actions since the execution of the Vendor Agreement served to ratify it. There is no evidence that Dyson ever objected to any of the Vendor Agreement's provisions. In particular, Dyson did not object to the Vendor Agreement's language including all of LNT

Merchandising's "affiliates" or the merger clause.  Further, Dyson accepted the benefits of payment in the form of checks from LNT Merchandising.  [Ex. B at ¶¶ 3-5.]  Dyson ratified the Vendor Agreement as the only valid contract existing concerning this litigation.

**B.     Dyson's Lawsuit Against Linens 'n Things, Inc. Should Be Dismissed.**

> *1.     Dyson's Lawsuit Should Be Dismissed Because Dyson Has Failed to State a Claim Against Linens 'n Things, Inc.*

A defendant may move to dismiss a lawsuit when the plaintiff fails to "state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  A court should grant the motion to dismiss if it finds that the plaintiff "can prove no set of facts that would entitle it to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

> *a.     Linens 'n Things, Inc. and Dyson did not have a contract.*

"For a breach of contract claim to survive a motion to dismiss, the plaintiff must allege that: (1) a contract existed, (2) plaintiff sufficiently performed its contractual obligations, (3) defendant breached its contractual obligations, and (4) as a result of defendant's breach, plaintiff suffered damages." *Classic Fire & Marine Ins. Co. v. Illinois Ins. Exchange*, No. 97 C 1256, 1997 WL 767290, at *3 (N.D. Ill. Dec. 3, 1997) (citing *Tibor Mach. Prods., Inc. v. Freudenberg-Nok Gen. Partnership*, 1996 WL 535338, at *2 (N.D. Ill. Sept. 19, 1996)).  Specifically, "'[w]here the allegations of a pleading are inconsistent with the terms of a written contract attached as an exhibit, the terms of the latter, fairly construed, must prevail over the averments differing therefrom." *Classic Fire*, 1997 WL 767290, at *3.

As established *supra*, the Vendor Agreement is the only valid contract at issue.  It does not even *mention* Linens 'n Things, Inc.  Instead, it is explicitly between LNT Merchandising and Dyson.  [*See generally* Ex. A-1.]  Because there is no existing contract between Linens 'n Things, Inc. and Dyson, a claim for breach of contract is not tenable.  *See Classic Fire*, 1997 WL

767290, at *3.  The Court should dismiss Dyson's claim for breach of contract against Linens 'n Things, Inc.

        *b.*     *The Court should dismiss Dyson's claim for unjust enrichment.*

A plaintiff may not bring a claim for unjust enrichment when an express contract governs its relationship with the defendant.  *Shaw v. Hyatt Intern. Corp.*, 461 F.3d 899, 902 (7th Cir. 2006) (affirming the dismissal of a claim for unjust enrichment when an express contract existed between the parties); *Cromeens, Holliman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003) (affirming the trial court's grant of summary judgment dismissing a claim of unjust enrichment when an "unambiguous" contract existed between the parties).  Dyson makes a claim for unjust enrichment.  [Docket Entry #1 at Ex. A, ¶¶ 33-36.]  However, an express contract in the form of the Vendor Agreement exists between LNT Merchandising and Dyson which also contains a merger clause including Linens 'n Things, Inc.  [Ex. A-1.]  Dyson's claim for unjust enrichment is untenable and should be dismissed.

       2.     *The Court should dismiss Dyson's claim for violation of the Illinois Deceptive Trade Practices Act.*

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  FED. R. CIV. P. 9(b).  A claim under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA") sounding in fraud "must…meet the pleading requirements of Federal Rule of Civil Procedure 9(b)."  *Nakajima All Co., Ltd. v. SL Ventures Corp.*, No. 00 C 6594, 2001 WL 641415, at *6 (N.D. Ill. June 4, 2001) (dismissing a plaintiff's claim for violations of the IUDTPA arising from defendant's misstatements concerning its relationship with the plaintiff for failure to plead with required particularity); *CardioNet, Inc. v. LifeWatch Corp.*, Civil Action No. 07 C 6625, 2008 WL 567031, at *2 (N.D. Ill. February 27,

2008) (dismissing a claim for violation of the IUDTPA for failure to plead the "'who, what, when, and where of the alleged fraud'").

Dyson fails to specify *who* "disparaged Dyson's products and business by making false or misleading representations of fact, in representing that the lack of Dyson products in Linens 'n Things, Inc.'s stores was a result of problems with Dyson's production, and/or that Linens 'n Things, Inc. has decided not to stock Dyson products because of problems with them." Dyson also fails to specify *when* the "false or misleading representations" were made, *where* they were made, and *how*. Dyson's claim for violations of the IUDTPA are wholly lacking in specificity and should be dismissed.

**C.    Dyson's Lawsuit Should be Dismissed Because LNT Merchandising Is a Necessary and Indispensable Party to the Lawsuit.**

A court may dismiss a suit for failure to join a necessary and indispensable party under Federal Rule of Civil Procedure 19. FED. R. CIV. P. 12(b)(7); *see Moore v. Ashland Oil, Inc.*, 901 F.2d 1445, 1447 (7th Cir. 1990) (affirming a district court's dismissal of a lawsuit for failure to join necessary and indispensable parties); *Shell Oil Co. v. Aetna Cas. And Sur. Co.*, 158 F.R.D. 395, 399 (N.D. Ill. 1994); *Askew v. Sheriff of Cook County, Ill.*, No. 06 C 4530, 2007 WL 1149129, at *1-2 (N.D. Ill. April 18, 2007).

*1.    LNT Merchandising is a necessary party, but its joinder is not feasible.*

First, a trial court must examine whether it is necessary to join a potential party to a lawsuit and if that joinder is even feasible. *Shell Oil Co.*, 158 F.R.D. at 399. A potential party is "necessary" to a lawsuit when it "claims an interest in the subject of the action." *Silberman v. Worden*, No. 87 C 8368, 1988 WL 96537, *4 (N.D. Ill. Sept. 15, 1988) (interpreting Federal Rule of Civil Procedure 19(a) and holding that a potential party had an interest in the litigation at issue). However, when joinder of the absent party would "thwart venue," it is not feasible

rendering Rule 19(a) inapplicable. *Winklevoss Consultants, Inc. v. Federal Ins. Co.*, 174 F.R.D. 416, 417 (N.D. Ill. 1997) (finding that a injured party in an insurance dispute was not a necessary or indispensable party in insured's declaratory judgment action against insurance carrier); *Shell Oil Co.*, 158 F.R.D. at 399; *see also Moore*, 901 F.2d at 1447. Instead, the Court should proceed directly to an analysis under Rule 19(b). *Winklevoss*, 174 F.R.D. at 417; *Shell Oil Co.*, 158 F.R.D. at 399.

LNT Merchandising undoubtedly has an interest in this litigation. It is the signatory and express party to the Vendor Agreement governing the relationship with Dyson. However, joinder of LNT Merchandising would destroy venue in this Court as the Vendor Agreement specifies New Jersey as the forum for litigation concerning it. [Ex. A-2 at ¶ 16.] The Court must instead determine if LNT Merchandising is an indispensable party to this litigation.

2.      *LNT Merchandising is indispensable.*

If joinder is not feasible under Rule 19(a), the court must decide "whether, in equity and good conscience, the action should proceed among the parties before it or should be dismissed because the absent person is indispensable." FED. R. CIV. P. 19(b); *Moore*, 901 F.2d at 1147; *Shell Oil Co.*, 158 F.R.D. at 399. Courts must employ the following four part test in determining if a party is indispensable:

a. possible prejudice to the non-party;

b. shaping the relief sought to avoid prejudice to the non-party;

c. the adequacy of a judgment; and

d. adequacy of remedy if case is dismissed.

*Id.* at 400-02.

LNT Merchandising satisfies each of these four factors.  It stands to suffer prejudice if it not is included in the current litigation.  This case concerns two separate contracts—the Terminated Contract and the Vendor Agreement.  LNT Merchandising was a party to both of these—not Linens 'n Things, Inc.  Hence, any adjudication of the parties' rights under the Terminated Contract or the Vendor Agreement necessarily implicates LNT Merchandising.  This also makes shaping any relief to avoid prejudice to LNT Merchandising an impossibility.

Further, because Linens 'n Things was not a party to either contract and LNT Merchandising was, any relief granted is inadequate.  A judgment's adequacy concerns "'the public interest in complete and efficient resolution by the wholes.'"  *Shell Oil*, 158 F.R.D. at 402.  Judgment without LNT Merchandising may very well result in further litigation as it strives to have its rights under the Vendor Agreement adjudicated.

Lastly, Dyson has an adequate remedy in the event this case is dismissed.  It can abide by the terms of the Vendor Agreement and bring suit in New Jersey.  It is an international company with the means to conduct litigation anywhere.

**D.    Venue Is Improper.**

> *1.    The case should be dismissed for improper venue.*

The Vendor Agreement explicitly specifies New Jersey as the venue for any litigation between the parties.  A forum selection clause is treated like any other contractual provision and, thus, enforced unless it is subject to infirmity.  *IFC Credit Corp. v. Aliano Bros. Gen. Contractors, Inc.*, 437 F.3d 606, 610 (7th Cir. 2006).  The United States Supreme Court has held that absent a "compelling reason" such as fraud, undue influence or unconscionably skewed bargaining power, forum-selection clauses should be enforced.  *M/S Bremen v. Zapata Off-Shore*

*Co.*, 407 U.S. 1, 12 (1972); *see also Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 761 (7th Cir. 2006).

Nothing in the complaint suggests that Linens 'n Things, Inc. or LNT Merchandising engaged in fraud or exercised undue influence in executing the contract. While the complaint does allege that Linens 'n Things, Inc. made false or misleading representations, all such alleged misrepresentations were made separate and apart from the negotiation and execution of the contract. [Docket Entry #1 at pp. 7-9.] The forum selection clause in the Vendor Agreement is valid and enforceable. Venue in this district is improper and warrants dismissal.

2.      *Alternatively, the case should be transferred to New Jersey.*

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought." 28 U.S.C. § 1404(a). "The presence of a forum selection clause is "'a significant factor that figures centrally in the district court's calculus.'" *Wilkinson Co. v. Krups North of America, Inc.*, 48 F. Supp. 2d 816, 817 (N.D. Ill. 1999). To show that a forum selection clause is unreasonable, a party must show that "'trial in the contractual forum will be so gravely difficult and inconvenient that he will for all purposes be deprived of his day in court.'" *Id.* (citing *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). A party waives its right to object to a forum on the grounds of inconvenience when it "freely" enters into a contract with a forum-selection clause. *Wilkinson*, 48 F. Supp. 2d at 818.

New Jersey does not present a "gravely" difficult or inconvenient forum for litigating this case. Moreover, some of the critical meetings concerning the Vendor Agreement occurred in

New Jersey, and, thus, certain key witnesses presumably still reside in that area.[5]  Important LNT Merchandising or Linens 'n Things, Inc. documents are also located there.  LNT Merchandising or Linens 'n Things, Inc. would bear an equal burden continuing litigation in Illinois.  There is no indication that Dyson—an international company—would be deprived of its "day in court" if the Court transferred this case to New Jersey.

### III.    PRAYER

WHEREFORE premises considered, Linens 'n Things, Inc. prays that the Court dismiss this lawsuit with prejudice or, in the alternative, transfer the case to the U.S. District Court for the District of New Jersey.

Dated:  April 28, 2008.

Respectfully submitted,

 s/ Casey L. Westover
Attorney for Defendant

Robert A. Roth (6200416)
Casey L. Westover (6276161)
Reed Smith LLP
10 South Wacker Drive
Chicago, IL 60606-7507
(312) 207-1000
rroth@reedsmith.com
cwestover@reedsmith.com

Barry M. Golden
Peter L. Loh
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201
(214) 999-4746
bgolden@gardere.com
ploh@gardere.com

---

[5] When considering a motion to transfer venue, a court may consider facts presented in "affidavit, deposition, stipulation or other relevant documents."  *Midwest Precision Services, Inc. v. PTM Indus. Corp.*, 574 F. Supp. 657, 659 (N.D. Ill. 1983).

## CERTIFICATE OF SERVICE

     I, Casey L. Westover, one of the attorneys for Defendant Linens 'n Things, Inc., hereby certify that on April 28, 2008, I electronically filed the foregoing "**Linens 'n Things, Inc.'s MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**" with the clerk of the Court using the ECF system which will send notification of such filings to the following:

Caroline C. Plater         Henry Kelly
Kelley Drye & Warren LLP     Kelley Drye & Warren LLP
cplater@kelleydrye.com       hkelly@kellydrye.com

                         s/ Casey L. Westover
                         Casey L. Westover

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DYSON, INC., an Illinois Corporation | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1:08-cv-02068 |
| | ) | |
| LINENS 'N THINGS, INC, a Delaware | ) | Judge: The Hon. Virginia M. Kendall |
| Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**APPENDIX IN SUPPORT OF LINENS 'N THINGS, INC.'S MOTION TO DISMISS**

| Exhibit | Description |
|---|---|
| A | Declaration of William Nadel |
| A-1 | Terminated Contract |
| A-2 | Vendor Agreement |
| B | Declaration of James Rigoli |

# EXHIBIT A

## DECLARATION OF WILLIAM NADEL

I, William Nadel, state and declare as follows:

      1.     My name is William Nadel. I am of sound mind, over the age of twenty-one years, have never been convicted of a felony or other crime involving moral turpitude, and I am capable of making this declaration. Unless otherwise stated, I have personal knowledge of the matters set forth herein and could testify competently thereto if called upon to do so.

      2.     From July 28, 2003 through December 4, 2007, I was employed at LNT Services, Inc. ("LNT Services"), an affiliate company of LNT Merchandising Company, LLC ("LNT Merchandising"). For a time during my employment at LNT Services, I held the position of Buyer of Floor Care. My duties included managing the business relationships on behalf of LNT Merchandising with various vendors who sold floor care products to LNT Merchandising. Aside from my employment at LNT Services and work on behalf of LNT Merchandising, I have worked as a "buyer" of products on behalf of 3 different retail chains for 8 years.

      3.     One of the vendors selling floor care products to LNT Merchandising was Dyson, Inc. ("Dyson"). I was responsible for LNT Merchandising's relationship with Dyson from on or about July 2003 through on or about October 2007 ("Dyson Relationship"). The Dyson Relationship included the following aspects:

          a.     overseeing the quantity and quality of the Dyson floor care products ("Dyson Products") for sale at Linens 'N Things, Inc.'s retail stores;

          b.     negotiating the terms of and executing a contract for the sale of Dyson Products on or about September 16, 2003, (the "Terminated Contract") a true and correct copy of which is attached and incorporated herein as Exhibit A-1;

      c.      negotiating the terms of and executing the Vendor Agreement for "Linens 'N Things" (the "Vendor Agreement") on or about March 20, 2006, a true and correct copy of which is attached and incorporated herein as Exhibit A-2;

      d.      Dyson's performance according to the terms of the Terminated Contract and the Vendor Agreement;

      e.      overseeing the advertising of the Dyson Products for their sale at Linens 'N Things, Inc.'s retail stores; and

      f.      the sales performance of the Dyson Products at Linens 'N Things, Inc.'s retail stores.

4.     The Terminated Contract consisted of a form that Dyson generated. I executed the Terminated Contract by hand writing my name on it. Ex. A-1 at p. 4. I also hand wrote the name "Linens 'N Things" below my signature. I hand wrote "Linens 'N Things" without regard or knowledge of the legal distinctions of any Linens 'N Things entities.

5.     From early 2004 through late 2006, one of my main points of contact at Dyson for the purposes of the Dyson Relationship was an individual named Tom Lawler ("Lawler"). Lawler held the position of National Account Manager at Dyson. I know Lawler's position at Dyson was National Account Manager from the Dyson business card Lawler gave me with that title on it. Other Dyson employees and officers also indicated that to me that Lawler's position at Dyson was National Account Manager.

6.     Lawler's duties on behalf of Dyson included being responsible for the Dyson Relationship. In my professional experience, an individual with the title of "National Account

Manager" or "account manager" at a product vendor would, indeed, have the same kinds of responsibilities that made up the Dyson Relationship on behalf of his vendor/employer.

7.    I communicated with Lawler by phone several times a week concerning the Dyson Relationship ("Lawler Phone Calls"). The Lawler Phone Calls took place from early 2004 through late 2006. Lawler indicated during some of the Lawler Phone Calls that he needed to confer with his superiors at Dyson before agreeing or committing to something on Dyson's behalf.

8.    The superiors at Dyson that I understood Lawler conferred with included Dave Bimschleger ("Bimschleger"), Dyson's Vice President of Sales, and Doug Kellam ("Kellam"), Dyson's President. I understood Bimschleger and Kellam to be Lawler's superiors at Dyson through my communications with Lawler and certain face to face meetings involving Lawler, Bimschleger, and Kellam described below. Furthermore, it is customary in the retail products industry for a "account manager" or "national account manager" like Lawler to report to a "vice president," "vice president of sales," and/or "president."

9.    I also communicated with Lawler through e-mail several times a week concerning the Dyson Relationship ("Lawler E-Mails"). The Lawler E-Mails took place from early 2004 through late 2006. Some of the Lawler E-Mails included other Dyson employees including, but not limited to, Bimschleger, Kellam, and Dyson's Chief Financial Officer Maria Tryan ("Tryan").

10.    I also met Lawler in person at Dyson's headquarters in Chicago, Illinois, at least once or twice a year from early 2004 through late 2006 ("Chicago Meetings"). The Chicago Meetings primarily concerned the sales performance and of the Dyson Products and way to improve sales of the Sales of the Dyson Products. Bimschleger, Kellam, and James Dyson, the Chief Executive Officer of Dyson's parent company were present at some of the Chicago

3

Meetings with Lawler and me. I understood Mr. Dyson to be the founder and namesake of the Dyson corporate family.

11.     I also met Lawler in person at LNT Services' headquarters in Clifton, New Jersey, about once a month from early 2004 through late 2006 ("New Jersey Meetings"). Bimschleger, Kellam, and Jeff Collins ("Collins"), Dyson's Vice President of Marketing, also attended a portion of the New Jersey Meetings with Lawler and me.

12.     On or about March 20, 2006, I executed the Vendor Agreement on behalf of LNT Merchandising and all of its affiliates. Ex. A-2. LNT Merchandising generated the form for the Vendor Agreement.

13.     Lawler executed the Vendor Agreement on behalf of Dyson.

14.     The following  both separately and collectively—led me to believe that Lawler had the authority to execute the Vendor Agreement on behalf of Dyson:

      a.     In my professional experience, an individual with the title and duties of a "national account manager" or "account manager" for a products vendor has the authority to negotiate and execute agreements such as the Vendor Agreement on behalf of his/her employer;

      b.     Lawler's statements during the Lawler Phone Calls that he had to seek approval from his superiors, Bimschleger and Kellam, before agreeing or committing to anything on behalf of Dyson;

      c.     The inclusion of Bimschleger, Kellam, and Tryan on the Lawler E-Mails;

      d.     Bimschleger, Kellam, and James Dyson's presence at some of the Chicago Meetings with Lawler and me; and

4

e.    Bimschleger, Kellam, and Collins' presence at the New Jersey Meetings with Lawler and me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 25 , 2008.

_William Nadel_

William Nadel

5

# EXHIBIT A-1

DYSON, INC
520 N. Erie, Suite 410
Chicago, IL 60610
Phone: (312) 469-5950    Fax: (312) 469-5952

*Attn: Julie*
*From: Bill Nadel*



Form FCA03
General Conditions of Sale

1 April 1999

1.  DEFINITIONS
    In these Conditions the following expressions shall have the following meanings:
    The Seller          Dyson Inc.
    The Buyer           The person, firm or company, referred to as "the Buyer" in the Seller's
                        Acknowledgement of Order form
    The Goods           The Goods described in the Seller's Acknowledgement of Order form
    The Contract        The Contract for the sale of the Goods by the Seller to the Buyer
    Particulars of      The particulars of the Contract set out on the face of the Seller's
    Contract            Acknowledgement of Order form.

2.  CONSTRUCTION OF CONTRACT
    (1) These Conditions shall apply to all contracts of sale (and to any ancillary services) between the Seller and the
        Buyer.
    (2) The terms of the Contract shall consist of the Particulars of Contract and these Conditions of Sale. These
        Conditions shall be construed subject to the Particulars of Contract.
    (3) No other terms contained in any document issued by either party or in any written or oral communication
        between the parties shall apply to the Contract nor shall these Conditions or the Particulars of Contract be
        modified without the written agreement of the Seller on or after the date of the Seller's Acknowledgement of
        Order.
    (4) In order that the Contract shall be a complete statement of the understanding between the parties with
        regard to the sale of the Goods, the Buyer must ensure that any pre-contractual representation on which it
        wishes to rely has been specified in the Particulars of Contract. In entering into the Contract, the Buyer does
        not rely upon any such representation made by or on behalf of the Seller which has not been so specified.
    (5) Descriptions and illustrations of the Goods submitted with any quotation or contained in any brochure or
        catalogue are only a general representation of the Goods and are not intended to be reliable with regard to
        details, as design modifications and improvements may be introduced.

3.  QUOTATIONS AND ORDERS
    (1) Unless accepted before lapse or withdrawal, quotations made by the Seller shall automatically lapse after
        seven days, but may be withdrawn earlier.
    (2) All orders placed by the Buyer on the Seller shall be subject to these Conditions of Sale.
    (3) There shall be no binding contract until the Seller has accepted the Buyer's order by sending to the Buyer an
        Acknowledgement of Order form. No employee or agent of the Seller has authority to contract in any other
        manner.

4.  DELIVERY
    (1) Delivery shall take place when the Goods are unloaded at or delivered to the Buyer's premises or other delivery
        location specified in the Contract, except that if the Buyer collects or arranges collection of the Goods from
        the Seller's premises, or nominates a carrier for the Goods, delivery shall take place when the Goods are
        loaded onto the collection or carrier's vehicle.
    (2) The Seller will endeavor to complete delivery on or before any delivery dates requested by the Buyer or
        estimated by the Seller but the Seller will not be liable for any delay in delivery.
    (3) The quantity of Goods delivered under the Contract shall be recorded by the Seller upon dispatch from the
        Seller's factory or warehouse and the Seller's record shall be accepted by the Buyer as conclusive evidence of
        the quantity delivered. It is the Buyer's responsibility to notify the Seller if the Goods have not been received
        within five days of the receipt of the Seller's invoice therefore. If no notification is made the Buyer shall be
        deemed to have received the Goods.
    (4) The Seller shall be entitled to deliver the Goods by installments and to invoice each installment separately.
    (5) The delivery of a greater or lesser quantity of the Goods than the quantity provided for in the Contract, the
        delivery of other goods not provided for in the Contract, or the delivery of Goods only some of which are
        defective, shall not entitle the Buyer to reject all the Goods delivered or to terminate the Contract in whole or in
        part nor shall any incorrect delivery or defect in respect of one or more installments entitle the Buyer to
        terminate the Contract of subsequent installments. Any claim in respect of error in quantity or type of Goods or
        in respect of the condition of Goods delivered must be made in writing to the Seller within five working days of
        receipt by the Buyer.

If the Seller agrees to arrange carriage or insurance on behalf of the Buyer, all charges and expenses in connection therewith shall be invoiced to the Buyer and paid within the period specified in Condition 9(1). The Seller shall not be liable for the suitability of the terms of any such carriage or the adequacy of any such insurance and sub-sections (2) and (3) of Section 35 of the Sale of Goods Act 1923 shall not apply to the Contract.

5.     PACKING
Packaging for the Goods shall be at the discretion of the Seller which shall have the right to pack the Goods in such manner and with such material and in such quantities as it, in its absolute discretion, thinks fit, unless detailed packaging instructions are received and agreed by the Seller prior to agreeing a price for the Goods and are then incorporated into the Contract.

6.     EXAMINATION AND CLAIMS
The Buyer shall upon delivery examine the Goods and shall promptly (but in any event within five working days of delivery) notify in writing the Seller (and the carrier, where relevant) of any apparent damage, defect or error in quantity or type of goods delivered. The Buyer shall comply with the carrier's rules, regulations and requirements so as, when appropriate, to enable the Buyer to make a claim against the carrier in respect of any loss or damage in transit. Claims in respect of damage, defects or error in quantity or type of goods delivered not apparent on examination upon delivery must be notified in writing to the Seller within fourteen days of the date of delivery.

7      PROPERTY AND RISK
(1)  The risk in the Goods shall pass to the Buyer upon delivery in accordance with the Contract notwithstanding that such delivery may not be at the final destination.
(2)  The property in the Goods shall remain the Seller until, and shall pass to the Buyer only when:
    (a)  payment shall have been made in full for:
        (i)    the Goods the subject of the Contract; and
        (ii)   all other goods the subject of any other contract between the Seller and the Buyer which, at the time of payment of the full price of the Goods sold under this Contract, have been delivered to the Buyer but not paid for in full;
    (b)  the Buyer sells the Goods to its customers by way of bona fide sale.
If payment for the Goods is overdue in whole or in part the Seller may (without prejudice to any of its other rights) recover or resell such of the Goods as are then still the Seller's property, or any of them, and may enter upon the Buyer's premises by its servants or agents for that purpose. Without prejudice to the provisions of clause 11 such payments shall become due immediately upon the occurrence of any of the events referred to in clause 11. Until the property in the Goods has passed to the Buyer, the Buyer shall store the Goods at its premises to which the Goods were consigned by the Seller, separately from goods belonging to the Buyer, and shall not remove any batch numbers or other identification, or any notices stating that they are the Seller's property. The Seller shall nevertheless be entitled at any time to pass the property in the Goods to the Buyer by giving the Buyer written notice to that effect. Without further consideration the Seller shall have the irrevocable authority of the Buyer to resell any Goods repossessed by the Seller pursuant hereto.

8      PRICES
(1)  Unless otherwise stated in the Particulars of Contract, prices for the Goods shall be ex-works and shall be exclusive of carriage and insurance.
(2)  Notwithstanding any quotation or any other statement as to price which may have been given in or in connection with the Contract the Contract price shall be the Seller's list price prevailing at the date of dispatch. Prior to dispatch of the Goods, the Seller shall notify the Buyer of any variation in the price between the date of the Seller's Acknowledgement of Order and the date of dispatch.

9      PAYMENT
(1)  Unless an agreed credit period is specified in the Contract the Contract price is to be paid forthwith upon receipt of invoice.
(2)  Payment shall be made direct to the Seller and the Seller's official receipt shall be the only acknowledged discharge of any debt. The Buyer shall not be entitled to withhold payment of any amount due to the Seller under the Contract by reason of any payment to a third party, credit, set-off, counter-claim, allegation of incorrect or defective goods, or for any other reason whatsoever which the Buyer may allege excuses him from performing his obligations under the Contract.
(3)  The Seller shall be entitled to charge interest on any overdue sum at the rate of 5 per cent per annum above the prime lending rate for the time being of the Commonwealth Bank of Australia Limited from the due date until the date of actual payment. The Buyer shall also reimburse to the Seller any legal costs and debt collection agency's fees incurred by the Seller in recovering or attempting to recover overdue payments from the Buyer.

10     WARRANTIES AND EXEMPTIONS

IN THE EVENT OF THE DELIVERY OF ARTICLES NOT ANSWERING TO THE CONTRACTUAL DESCRIPTION OR OF THE GOODS DEVELOPING, UNDER PROPER USE, ANY DEFECT DURING A PERIOD OF 24 MONTHS FROM THE DATE OF DELIVERYT TO THE BUYER, DUE TO DEFECTIVE MATERIALS OR WORKMANSHIP (OTHER THAN THE GOODS OR PACKAGING PRODUCED TO THE BUYER'S SPECIFICATION), THEN PROVIDED THAT THE BUYER IS NOT IN BREACH OF ANY OF ITS OBLIGATIONS TO THE SELLER UNDER THIS OR ANY OTHER CONTRACT. THE SELLER SHALL, AT ITW OWN EXPENSE, REPLACE OR REPAIR SUCH ARTICLES OR GOODS AS ARE INCORRECT OR DEFECTIVE SO AS TO REMEDY THE DEFECTS OR, AT THE SELLER'S OPTION, REFUND THE PURCHASE PRICE ATTRIBUTABLE TO THE INCORRECT OR DEFECTIVE ITEMS, EXCEPT WHERE SUCH DEFECTS ARE ATTRIBUTABLE TO ACCIDENT, FAIR WEAR AND TEAR OR ANY ACTION OMISSION

– OR –

NEGLECT OF THE BUYER OR ITS AGENT
THE BUYER MUST GIVE THE SELLER NOTICE OF ANY ALLEGED DEFECT AS SOON AS IT BECOMES APPARENT, AND SHALL (UNLESS OTHERWISE INSTRUCTED BY THE SELLER) RETAIN THE GOODS AT THE BUYER'S PREMISES FOR INSPECTION BY THE SELLER AND GIVE THE SELLER ADEQUATE FACILITIES TO INVESTIGATE THE COMPLAINT AT THE BUYER'S PREMISES. IF THE SELLER SO REQUESTS, THE BUYER SHALL AT ITS OWN EXPENSE RETURN THE DEFECTIVE GOODS OR PARTS TO THE SELLER PROVIDED THAT IF THE SELLER IS LIABLE TO REPLACE OR REPAIR SUCH DEFECTIVE GOODS OR PARTS PURSUANT HERETO THEN THE SELLER SHALL REIMBURSE THE BUYER'S RESONABLE CARRIAGE EXPENSES IN CONNECTION THEREWITH. IF THE BUYER SHALL RETURN TO THE SELLER ANY GOODS OR PARTS WHICH ARE NOT DEFECTIVE, THE BUYER SHALL PAY THE COMPANY'S RESONABLE CHARGES FOR HANDLING, TESTING AND RETURNING SUCH ITEMS TO THE BUYER AS WELL AS ANY ASSOCIATED COSTS INCURRED BY THE SELLER.

11.   INSOLVENCY AND DEFAULT
In the event of the Buyer becoming (or appearing to the Seller to be about to become) bankrupt or insolvent, ceasing or threatening to cease business, dying or (are (or appearing to be the Seller to be about to go) into liquidation, suffering the appointment of a receiver, receiver and manager or voluntary administrator, failing to pay its debts as they become due, making any arrangement with creditors, failing to make any payment due hereunder or being in breach of any other term of the Contract the Seller shall be entitled, without prejudice to its other rights, to postpone delivery (both in respect of the Contract or series of Contracts in question and any other contracts with the Buyer) until such payment has been made or other breach rectified and, also (or as an alternative) to determine the Contract (any/or any other such contracts) and to recover payment for all deliveries already made (whether or not such payment is otherwise then due) and for the cost of materials and labour already expended for the purpose of future deliveries (less any allowance of the value thereof as utilised by the Seller for other purposes) and also to recover from the Buyer a sum equivalent to the Seller's loss of profit arising out of such determination.

12.   PATENTS ETC.
(1) Where all or any of the packaging for the Goods is produced to the Buyer's specification, the Buyer shall indemnify the Seller against all actions, claims, costs, damages or losses arising from any infringement of registered design, trade mark, design right, copyright or any similar protection in respect of the packaging so produced.
(2) Any reference by the Seller to patents, design rights, copyrights, registered designs, trade marks, and analogous forms of protection shall not constitute a warranty of the validity thereof.

13.   EXCLUSION OF DAMAGE
The law implies terms, conditions and warranties ("prescribed terms") into contracts for the supply of goods and services and prohibits the exclusion, restriction or modification of certain terms, conditions and warranties. Some prescribed terms permit a supplier to limit its liability for a breach of the prescribed terms. Except as provided by prescribed terms and to the fullest extent permitted by law:-
(1) The liability of the Seller in respect of a breach of a prescribed term relating to the products or any part thereof is limited at the option of the Seller to the replacement or repair of the products or any part thereof or payment of the cost or repairing or replacing the products or any part thereof;
(2) In these conditions the Buyer shall not under any circumstances have any cause of action against or right to claim or recover from the Seller for, or in respect of, any loss or damage of any kind whatsoever, caused directly or indirectly by any defect in material or workmanship of, or any other defect whatsoever in, or unsuitability for, any purpose of the products or any part thereof, or by default or negligence on the part of the Seller or of any servant, contractor or agent of the Seller relating to the supply of, or otherwise concerning the products or any part thereof.

Acceptance of above terms.
I/We accept the above terms and conditions of sale.

Signature _William Nadel_____ on    behalf    of    (Company    Name)

Linen's N Things's    William Nadel

Name (please print) ___William Nadel_____ Date _9/16/03_____

_____President

10/29/01

# EXHIBIT A-2

# VENDOR AGREEMENT FOR "LINENS 'N THINGS"

This Vendor Agreement, dated as of 3/20/2006 , (hereinafter "Vendor Agreement") is entered into by and between LNT Merchandising Company, a Delaware limited liability company, with its principal place of business located at 6 Brighton Road, Clifton, NJ (hereinafter, together with its affiliates, "LNT") and:

DYSON INCORPORATED
(Name of Vendor)

600 WEST CHICAGO AVE.,S
(Address of Vendor)

IL
(State or Jurisdiction of Incorporation)

hereinafter referred to as "Vendor." Vendor must supply the additional information requested on the attached VENDOR PROFILE FORM. The VENDOR PROFILE FORM is a part of this Vendor Agreement. Both LNT and the Vendor may be referred to herein separately as "Party" or together as the "Parties."

1.  Appointment of Vendor: LNT hereby designates Vendor as an approved non-exclusive supplier of merchandise. LNT may from time to time, in its sole discretion, place orders for the purchase of merchandise with Vendor. Nothing in this Vendor Agreement obligates LNT to transact any business with Vendor. LNT and Vendor expressly acknowledge that no partnership, joint venture or agency relationship is intended or created by reason of this Vendor Agreement.

2.  Term of Agreement: This Vendor Agreement will remain in effect until terminated by either Party. Except as set forth below in this paragraph 2, this Vendor Agreement may be terminated at will by either Party, in writing, with or without cause. However, in the event this Vendor Agreement is terminated, Vendor agrees to satisfy all pending purchase orders for merchandise placed by LNT unless otherwise notified by LNT. Termination of this Vendor Agreement will not affect the respective rights and obligations of the Parties with respect to any merchandise theretofore ordered (subject to Vendor's obligations and LNT rights under the preceding sentence) or purchased pursuant to this Vendor Agreement. In the event this Vendor Agreement is terminated and Vendor's account with LNT has a debit balance, the Parties agree that LNT shall have the right, in addition to all other rights and remedies of LNT, to chargeback such debit balance against any outstanding Vendor invoices. Termination shall not limit LNT's right to collect any amounts owed by Vendor. In the event Vendor is on a replenishment program, Vendor may only terminate this Agreement upon one hundred twenty (120) days prior written notice to LNT. LNT shall have the option of accepting such termination prior to the end of said one hundred twenty (120) day period. In the event Vendor fails to give said one hundred twenty (120) days prior written notice, Vendor agrees that Vendor shall be liable for LNT's transition costs.

3.  Terms of Purchase/Sale Transactions: The terms of any purchase/sale transaction between the Parties are exclusively set forth herein, and in any purchase order issued by LNT, notwithstanding any contrary or additional terms contained in any invoice, statement or other communication from Vendor. The terms of any purchase/sale transaction as set forth herein or in any such LNT purchase order may only be modified in a writing containing the signature of an authorized representative of LNT.

4.  Preticketing and Barcoding: Vendor agrees to preticket and bar code, with a correct UPC and LNT specified retail price, all merchandise sold to LNT, and to otherwise comply with all requirements of LNT's then current VENDOR MANUAL, which is incorporated into and made a part of this Vendor

Agreement by reference. Vendor understands and agrees that LNT's transportation, logistics, and inventory systems demand strict compliance with these requirements. Vendor will be assessed a chargeback to Vendor, which in LNT's discretion may be taken in the form of a credit against amounts payable to Vendor, in amounts either set forth in the VENDOR MANUAL or, if of a type or severity not set forth in the guide, as otherwise established by LNT, in order to compensate LNT for any failure to comply with the requirements of LNT's VENDOR MANUAL. LNT reserves the right to amend its VENDOR MANUAL from time to time and any such modification shall apply to all purchase orders made by LNT beginning ten (10) days following the effective date of such modification. LNT's form of VENDOR MANUAL, as then in effect, is available to all authorized Vendors by accessing the same from LNT's website, or otherwise upon request to LNT. Upon LNT's request, Vendor agrees, at Vendor's expense, to pre-tag all merchandise with electronic article surveillance sensor tags, provided by an LNT-approved supplier.

5.  Electronic Data Interchange (EDI): LNT requires that Vendor be EDI capable in order to facilitate the exchange of information with Vendor. In the event Vendor is not EDI capable, LNT may charge Vendor a per invoice charge. The amount charged for each such invoice shall be outlined within LNT's VENDOR MANUAL and is subject to change from time to time, effective ten (10) days following the date of such change. In addition, the Parties acknowledge and agree that the execution and delivery of this Vendor Agreement by the Parties may be by electronic means, and all purchase orders issued hereunder may be placed and accepted by electronic means, and, as such, shall be considered valid and enforceable signed writings.

6.  Payment Terms: Except as otherwise provided in a writing signed by LNT, payment by LNT for merchandise purchased from Vendor will be rendered on a net sixty (60) day basis from LNT's receipt of the bill or invoice from Vendor.

7.  Damage Expense Offset: A Damage Expense Offset (the "Damage Expense Offset") in the amount equal to the greater of (i) 2% of gross receipts of merchandise purchased, or (ii) the Damage Expense Offset set forth in the Vendor Profile Form for Vendor, will be deducted monthly from all accounts payable to Vendor to offset damages incurred during the period in which merchandise from the Vendor was purchased by LNT. LNT may elect to reconcile Vendor's account within a reasonable time after the end of each fiscal year of LNT during the Term hereof to determine if damage was in excess of the Damage Expense Offset amount then in effect for Vendor. If damages during the annual period are determined to be in excess of the Damage Expense Offset in effect for Vendor, Vendor shall be subject to chargebacks for the excess and LNT may also increase the Damage Expense Offset in the Vendor Profile Form. If damage is determined to be less than the Damage Expense Offset in effect for Vendor, Vendor shall nevertheless be subject to at least the established Damage Expense Offset applicable to the Vendor. In the event that merchandise is returned to Vendor, for any reason, LNT shall retain the Damage Expense Offset. Salvage rights to all damaged merchandise shall belong to LNT.

8.  Shipping: Vendor understands the critical nature of shipping merchandise in a timely and conforming manner and acknowledges that LNT may suffer monetary losses and/or loss of customer goodwill in the event Vendor fails to strictly comply with LNT's shipping requirements. Vendor, at Vendor's cost and expense, agrees to pay for the transport of merchandise from Vendor's sources to LNT's final distribution point. To the extent that it is applicable to the method of shipping elected by Vendor, Vendor agrees to comply with the requirements of LNT's then current VENDOR MANUAL which is incorporated into and made a part hereof by reference. LNT reserves the right to amend its VENDOR MANUAL from time to time, and any such modification shall apply to all purchase orders made by LNT, effective ten (10) days following the date of such modification. LNT's form of VENDOR MANUAL is available to all authorized Vendors by accessing the same from LNT's website or otherwise upon request to LNT. Vendor hereby agrees to ship to LNT according to the terms elected in the Vendor Profile Form. An inbound Freight Expense Offset (the "Freight Expense Offset") in an amount equal to the greater of (i) 2.6% of gross receipts of merchandise purchased, or (ii) the inbound freight Expense Offset set forth in the Vendor Profile Form for Vendor will be deducted monthly from all accounts payable to Vendor to offset freight costs incurred during the period in which merchandise from the Vendor was purchased by LNT. LNT may elect to reconcile Vendor's inbound freight account twice a year, during the Term hereof, to determine if inbound freight cost(s) are in

excess of the Freight Expense Offset amount then in effect for Vendor. If inbound freight expenses are determined to be in excess of the Freight Expense Offset in effect for Vendor, Vendor shall be subject to a chargeback for the excess, and LNT may also increase the Freight Expense Offset in the Vendor Profile Form to account for the difference. If inbound freight is determined to be less than the Freight Expense Offset then in effect for Vendor, LNT agrees to make Vendor subject to this lower rate for the future transport of merchandise;. Notwithstanding anything above to the contrary, in the event that merchandise is returned to Vendor by LNT, for any reason, LNT shall retain the Freight Expense Offset in effect at the time such merchandise was shipped.

9.  **New Store Terms/New Business Terms/Expense Offset:** Payment by LNT for orders designated as New Store orders (which term includes orders designed to stock and re-stock New Stores within thirty (30) days of a New Store opening) will be rendered on a net ninety (90) day basis. In addition, Vendor agrees to a ten percent (10%) discount (herein "New Store/Business Expense Offset"), which will be deducted by LNT when paying related invoices. LNT requires that any merchandise ordered for a New Store/Business shall be shipped complete between the ship dates and cancel dates set forth in the purchase order. Vendor understands and agrees that strict compliance with this requirement is critical to LNT for the successful opening and initial operation of a New Store/Business. Due to the critical nature of New Store/Business openings, Vendor agrees to be subject to a minimum chargeback of twenty-five percent (25%) of the entire cost of the purchase order for any order shipped after the cancel date and/or received by LNT less than ninety-five percent (95%) complete, such chargeback not to exceed the value of the merchandise ordered by LNT. In addition, LNT shall have the right, at Vendor's expense, to expedite late arriving merchandise to New Store/Business location(s) or require Vendor to ship directly to any New Store/Business location(s).

10.  **Marketing:** To support the selling costs incurred by LNT on behalf of the Vendor, Expense Offsets are provided by Vendor to LNT in connection with LNT's selling costs (markdowns and advertising expenses) for Vendor's merchandise and Vendor agrees to the "Direct Cost Expense Offsets" set forth on the Vendor Profile Form. Notwithstanding the foregoing, LNT and Vendor may mutually agree on additional selling Expense Offsets from Vendor from time to time over and above the Direct Cost Expense Offsets set forth on the Vendor Profile Form. The Vendor has the right to obtain support for the calculation of the Direct Cost Expense Offsets by LNT, as based on the stated Expense Offset percentage applied against LNT's cost of the merchandise purchased by LNT from Vendor during the Term; provided that the good faith determination by LNT will be final and binding on the Parties, absent any manifest error.

11.  **New, Test, Seasonal,Promotional , and Replenishment Product/Orders [Two Date Orders]:** (a) LNT orders for new, test, seasonal, promotional and/or replenishment merchandise shall display two dates: a ship date and a cancel date. Vendor shall have forty-eight (48) hours from the time of receiving the order for such new, test, seasonal, promotional, or replenishment merchandise to respond to LNT, in writing, with any necessary proposed adjustment to the order, subject to LNT's written acceptance of any such proposed adjustment to the order. If Vendor fails to respond within said forty-eight (48) hours, LNT shall consider such order a firm agreement by Vendor. LNT will issue groups of orders to Vendor on the same day, for the same product. These like orders sent by LNT to Vendor, on that same day, may have different destinations and ship dates but the total set of orders (as a whole) shall be referred to as the "LNT Commitment" to purchase from Vendor. Vendor understands and agrees that strict compliance in satisfying the entire LNT Commitment , including shipment within time sensitive ship dates and cancel dates, is critical to the successful sale and promotion of such merchandise ordered by LNT. If a LNT Commitment (the full set of like orders) is (i) shipped after the cancel date specified in the orders, (ii) not shipped, and/or (iii) shipped less than ninety-five percent (95%) complete in the aggregate, Vendor agrees to be subject to a minimum chargeback of ten percent (10%) of the cost of the entire LNT Commitment (a complete schedule of "Off-set Expenses" is documented in the VENDOR MANUAL). In addition, LNT shall have the right, at Vendor's expense, to expedite late arriving merchandise to LNT's store locations, or, upon LNT's request, require Vendor to ship directly to stores.

(b) LNT reserves the right to cancel any purchase order, LNT Commitment, or the remaining balance of any purchase order or LNT Commitment not shipped within the definitive timing rules set forth in VENDOR MANAUL.

(c) To support the assessment, or purchase and promotion of new or existing merchandise to be sold by LNT, Vendor agrees to abide by all the standards set forth in the VENDOR MANUAL, at no

cost to LNT, when providing the following materials, and as defined in the VENDOR MANUAL: (i) Product Samples, (ii) Accurate Product Attributes and Dimensions, (iii) Digital Photography of Product, (iv) Proof Global Social compliance, and (v) a Link between all Vendor web sites that do not offer merchandise for sale, and any LNT web site created for the sale of merchandise.

12.   Notice Required: In the event Vendor disputes any (i) chargeback(s), or (ii) Expense Offset(s), or (iii) other deduction or credit taken by LNT in connection with LNT's VENDOR MANUAL, or (iv) the terms of this Vendor Agreement (including the Vendor Profile Form), Vendor shall notify LNT of such dispute in writing (together with all of Vendor's detailed information supporting each disputed item) via hand delivery, certified mail, courier service or facsimile transmission, within one hundred twenty (120) days of the date on which such chargeback(s), Expense Offset(s) or other deduction or credit appears on a check stub/LNT remittance advice, or other written communication to Vendor or its duly authorized agent. Strict compliance with this notice procedure is acknowledged by Vendor to be important in resolving any claims of disputed items, and Vendor hereby agrees to waive and release any claim for any chargeback(s), Expense Offset(s) or other deduction or credit for which Vendor has failed to provide the notice and supporting information as required above.

13.   Indemnification: Vendor shall indemnify, defend and hold harmless LNT, its affiliates and each of their respective officers, directors, employees and agents from and against any and all claims, obligations, liabilities, actions, damages, losses, costs and expenses (including reasonable fees and costs of legal counsel chosen by LNT) and other expenses arising out of or related to: (i) any claimed or alleged defect in any merchandise sold by, on behalf of, or through Vendor to LNT, or (ii) any act or omission of Vendor in breach or violation of this Vendor Agreement, or any breach of or inaccuracy in any representation or warranty of Vendor, or (iii) any claimed or alleged violation or infringement by Vendor of any other contract, law or legal requirement, or (iv) any claim or allegation that any merchandise sold by, on behalf of, or through Vendor to LNT violates, infringes or interferes with any intellectual property right or other proprietary right of any third party (including any claimed patent, trademark, trade name, service mark or other intellectual property right). Vendor shall not settle any indemnified claim without LNT's approval, and in no event shall any such settlement involve or require any payment or obligation by LNT. Without limiting any other terms or conditions of the paragraphs in this Vendor Agreement (including paragraph 2 above), the respective rights and obligations of the Parties under this paragraph 13 shall survive any termination of this Vendor Agreement.

14.   Compliance with Applicable Laws, and Other LNT Matters: With respect to the manufacture, sale, and/or import of merchandise sold by, on behalf of, or through Vendor to LNT, Vendor agrees and hereby certifies that Vendor shall ensure strict compliance with all applicable laws and regulations, including those of the United States, and those of any foreign country in which the merchandise is manufactured, or from or through which it is exported or imported (including, without limitation, labor laws and duty, import and export laws and restrictions). In no event shall the manufacture of any such merchandise involve child or forced labor, as detailed in LNT's Manufacturer's Code of Conduct. Vendor also agrees at all times to strictly comply with LNT's established VENDOR MANUAL, LNT's Compliance Program Guidelines and Factory Monitoring Expectations (inclusive of LNT's Manufacturing Code of Conduct), and other terms and conditions of the manufacture of merchandise and its sale to LNT, as each of the foregoing documents may be in effect from time to time, and which can be found by accessing www.LNT.com under the link to Vendor Services.

15.   Intellectual Property: (a) Vendor represents and warrants that no merchandise or goods sold by, on behalf of, or through Vendor to LNT (including any designs or methods for any such merchandise or goods and including any merchandise or goods specifically manufactured for LNT as private label merchandise) violates, infringes or interferes with any intellectual property right or other proprietary right of any third party (including any claimed patent, trademark, trade name, service mark or other intellectual property right); and (b) except as expressly set forth in any purchase order issued by LNT, Vendor (i) shall have no right to use any LNT trademarks or trade names for any purpose, (ii) shall not register any LNT trademark or product designation in any jurisdiction for any reason, , (iii) shall not make any item developed (which term shall include any guidance or assistance from LNT regarding a new/improved/different product design, functionality, composition, texture, or color) in

conjunction with, or at the direction of LNT, available to any other outlet or retailer, as this product shall remain the sole property of LNT, and (iv) shall not make any item commissioned or ordered by LNT available for sale via the Internet. Vendor shall not incorporate any LNT trademark or trade name into any domain name or meta tag on any web site operated directly or indirectly by Vendor, unless expressly approved by LNT in writing.

16. Governing Law, Jurisdiction, Venue and Attorneys' Fees: This Vendor Agreement is entered into in, and shall be governed by and construed under the laws of, the State of New Jersey. The federal and state courts within the State of New Jersey shall have exclusive jurisdiction to adjudicate any dispute arising out of or related to this Vendor Agreement. Vendor hereby expressly consents to (1) the personal jurisdiction of the federal and state courts within the State of New Jersey, and (2) service of process being effected upon it by registered mail sent to the address set forth at the beginning of this Vendor Agreement. In the event of any litigation or other legal action or proceeding between the Parties which arises out of or is related to this Vendor Agreement, the non-prevailing Party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing Party in connection with such litigation, action or proceeding.

17. Disclosure of Confidential Information: Each Party shall hold in confidence and shall not disclose to any third party the other Party's proprietary or confidential information ("Confidential Information") disclosed to it by the other Party, except as expressly permitted under this Vendor Agreement. The Parties shall use such Confidential Information only for the purpose for which it was disclosed and shall not exploit such Confidential Information for its own benefit or the benefit of another without the prior written consent of the disclosing Party. Each Party shall disclose Confidential Information of the other Party only to its employees and consultants who have a need to know such Confidential Information in the course of the performance of their duties and who are legally bound to protect the confidentiality of such Confidential Information. In the case of such consultants, the Party shall obtain a written agreement substantially similar to this Vendor Agreement and, in the case of such employees, the Party shall obtain a written acknowledgment of the confidentiality.

18. Proprietary Products: Vendor may not sell merchandise with the Linens 'n Things and/or LNT trademark and service mark (or any other trade name, trademark or service mark of LNT) to a party other than LNT, except only with the written approval from LNT prior to the sale of such merchandise. In such event (i) all price tickets shall be removed, (ii) all labels denoting the merchandise as "Irregulars" or "Seconds" shall be prominently placed on the product, and (iii) Vendor shall insure such merchandise is not sold in locations that directly compete with an LNT trade area and, in all events, such merchandise shall be distributed outside the New York/New Jersey trade area.

19. Miscellaneous.:
(a) This Vendor Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof and supersedes all prior agreements, both oral and written, between them as those agreements may relate to the subject matter of this Vendor Agreement. This Vendor Agreement may be changed only by a written agreement signed (which may be by electronic signature) by the Parties or their authorized representatives.
(b) The rights and obligations under this Vendor Agreement may not be assigned by Vendor without the express written consent of LNT. LNT shall have the right to assign its rights under this Vendor Agreement.
(c) This Vendor Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.
(d) If any term or provision of this Vendor Agreement is held by a court or other tribunal of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms and provisions of this Vendor Agreement shall remain in full force and effect, and shall in no way be affected, impaired or invalidated.
(e) The headings used in this Vendor Agreement are for convenience only and are not to be considered in connection with the interpretation or construction of this Vendor Agreement.
(f) EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS VENDOR AGREEMENT, ANY OF THE RELATED DOCUMENTS, OR ANY TRANSACTIONS

CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND
WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

IN WITNESS WHEREOF, LNT and Vendor have caused this Agreement to be duly executed and
delivered in their respective names and which will be in effect as of _____ , 2006.

LNT MERCHANDISING COMPANY,                Vendor Name:  DYSON INCORPORAT
a Delaware limited liability company

Name:   BILL NADEL                        Name:   Thomas Lawler

Title:                                    Title:   National Acct. Mgr.

Date:   3/20/2006                         Date:   5/15/2006

Next >>

03-13-2008   15:04   From-                 T-163   P.008/011   F-214

## VENDOR PROFILE

| | Vendor AP # | 18156 | Currency For Payment: | |
| C Vendor Change | Vendor UPC # | | Entered A/P On: | |
| C New Vendor | Dep't | VACUUMS AND IRON | By: | |

This agreement has been approved by: | SILVER |

Vendor Name: | DYSON INCORPORATED |

| | | | | |
| Corporate Name: | DYSON INCORPORATED | | Shipping/Logistics Contact: | EMILY EVANS - 312-7 |
| Corporate Address: | 600 WEST CHICAGO AVE., SUITE 275 CHICAGO | | Title: | 8 |
| DUNS #: | DUNS# 119523277 | | Address: | |
| Phone #: | 8666939766 | | | |
| Fax #: | 13124695951 | | Phone #: | |
| 800 #: | | | Fax #: | |
| | | | Email Address: | tom.lawler@dyson.com |
| NAFTA Contact: | | | Return Goods Address: | SONWIL DISTRIBUTION CENTER |
| Phone #: | | | | |
| Email Address: | | | Phone #: | 0 |
| | | | Fax #: | 7168530121 |
| Remittance Name: | DYSON INCORPORATED | | Email Address: | |
| Remittance Address: | 520 W ERIE ST. SUITE 410 | | Blanket RA #: | |
| Phone #: | 8666939766 | | | |
| Fax #: | 3124695951 | | Origin Addresses of freight being shipped: | |
| 800 #: | | | | |
| Factor Name: | | | Hours of Operation: |     to     |

http://lntweb/home/VNAgreement/VendorProfileVN.asp?aid=2978&act=3&view=1&com...   3/13/2008

03-13-2008  15:04   From-                                    T-163   P.008/011   F-214

| | | |
|---|---|---|
| Factor Address: | | Operations Contact: |
| | | Phone #: |
| EDI Contact Name: | EMILY EVANS - 312- | Email Address: |
| Phone #: | | Add'l Approved Freight Shipping Point: |
| Fax #: | | |
| Email Address: | emily.evans@dyson.com | Hours of Operation:      to |
| Sales Contact Name: | C/O MAUREEN MORIARTY | Operations Contact: |
| Address: | 175 KENSINGTON ROAD | Phone #: |
| Phone #: | 3125456160 | Email Address: |
| Fax #: | 2016348617 | |
| Email Address: | Maureen.Moriarty@dyson.com | |

Website Administrator Contact Name:

Phone #:

Email Address:

| | | | |
|---|---|---|---|
| ASN Capable? | ◦ Yes  ◦ No | If no, future date: | |
| EDI Capable? | ◦ Yes  ◦ No | If no, future date: | |
| UCC 128 labeling: | ◦ Yes  ◦ No | If no, future date: | |
| Internet capable? | ◦ Yes  ◦ No | If no, future date: | |
| Internet E-Mail Address: | ◦ Yes  ◦ No | If no, future date: | |

Payment Terms: NET 50 DAYS          New Store Terms: 10% & 30 EXTRA DAY

METHOD OF PAYMENT: Check if Vendor participates in LNT Accelerated Payment Program:
◦ Yes  ⦿ No

Damage Expense Offset:   0    % Of Gross Receipts

Shipping Terms:
Merchandise Terms (Choose One).

  &#9673; FOB Origin

  &#9675; FOB Destination

Vendor hereby elects to ship to LNT on the following basis (Choose One):

  &#9673; 2 % of gross receipts to be deducted monthly from any accounts payable to Vendor as Freight Expense Offset to fund the cost of transporting merchandise from Vendor to LNT.

  &#9675; Vendor agrees to pay all shipping freight charges directly.

---

<u>Other Terms</u>: Check if applicable:

☑ Expense Offsets to cover the following costs incurred by LNT on behalf of the Vendor: Markdowns and Advertising Expenses (these Expense Offsets are referred to as the "Direct Cost Expense Offsets"):
4 % of cost of merchandise purchased by LNT from Vendor during the period, deducted monthly

☐ If cost of merchandise purchased by LNT from Vendor during |_____ (period) are equal to or greater than:

|_____ · Vendor Expense Offsets to LNT |_____ % of cost of merchandise purchased by LNT from Vendor

|_____ Vendor Expense Offsets to LNT |_____ % of cost of merchandise purchased by LNT from Vendor

|_____ Vendor Expense Offsets to LNT |_____ % of cost of merchandise purchased by LNT from Vendor

|_____ Vendor Expense Offsets to LNT |_____ % of cost of merchandise purchased by LNT from Vendor

|_____ Vendor Expense Offsets to LNT |_____ % of cost of merchandise purchased by LNT from Vendor

|_____ · Vendor Expense Offsets to LNT |_____ % of cost of merchandise purchased by LNT from Vendor

---

LNT Buyer: BILL NADEL   Vendor Email: |_____

Buyer Phone: |973-778-1300

'03-13-2008  15:04   From-                                        T-163  P.011/011  F-214

| Buyer Fax: | 973-778-3085 |
| Buyer E-Mail: | BNADEL @lnt.com |

The above has been agreed to by:

Authorized Vendor Rep Name
Thomas Lawler
Authorized Vendor Rep Title
National Acct. Mgr.
Date of Signature
5/15/2006 8:04:51 AM

Linens 'n Things Name
BILL NADEL
Linens 'n Things Title

Date of Signature
3/20/2006

**Return to Agreements Page**

# EXHIBIT B

### DECLARATION OF JAMES RIGOLI

I, James Rigoli, state and declare as follows:

1.    My name is James Rigoli. I am of sound mind, over the age of twenty-one years, have never been convicted of a felony or other crime involving moral turpitude, and I am capable of making this declaration. Unless otherwise stated, I have personal knowledge of the matters set forth herein and could testify competently thereto if called upon to do so.

2.    I am a Vice President and the Controller of LNT Services, Inc. In that capacity, I have personal knowledge of the finances of LNT Merchandising Company, LLC and Linens 'N Things, Inc.

3.    I am aware that LNT Merchandising Company LLC has issued checks to Dyson, Inc. since 2003, and that Dyson, Inc. has cashed those checks.

4.    Since September 16, 2003, Linens 'N Things, Inc. has not issued any checks to Dyson, Inc.

5.    I understand that Dyson, Inc. has filed a lawsuit relating to invoices #s 576995, 576996, 576997, 576998, 576999, 577000, 577001, 577196, 577196, 577197, 577225, 619414. Had those invoices been paid to Dyson, Inc., they would have been paid by the issuance of a check from LNT Merchandising Company LLC to Dyson, Inc., just like all of the other invoices issued from Dyson, Inc.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 28, 2008.

James Rigoli