IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DYSON, INC., an Illinois Corporation,<br><br>  Plaintiff<br><br>v.<br><br>LINENS 'N THINGS, INC., a Delaware Corporation,<br><br>  Defendant. | No. 08-cv-2068<br><br>Honorable Virginia M. Kendall |

### PLAINTIFF'S MOTION TO SET A BRIEFING SCHEDULE ON DEFENDANT'S MOTION TO DISMISS TO ALLOW FOR LIMITED DISCOVERY

Plaintiff, Dyson, Inc., ("Dyson") respectfully moves this Court for entry of a briefing schedule on Defendant, Linen 'N Things, Inc.'s Motion to Dismiss (Doc. Nos. 13, 15), allowing for limited discovery regarding issues presented in the Motion to Dismiss to be completed prior to the filing of Plaintiff's opposition brief to the Motion to Dismiss. In support thereof, Plaintiff states as follows:

1. On March 11, 2008, Plaintiff filed this one count breach of contract action in the Circuit Court of Cook County, Illinois. On April 11, 2008, Defendant removed the action to this Court on the basis that there is diversity jurisdiction. Plaintiff's complaint is brought to enforce the terms of a contract for the sale of goods executed between Dyson, Inc. and the Defendant Linens 'N Things, Inc. (The "Dyson Agreement," attached hereto as Exhibit A.)

2. On April 28, 2008, Defendant filed its Motion to Dismiss the complaint, primarily on the basis that any action must be brought in New Jersey. (Doc. Nos. 13, 15.) On April 30, 2008, the Court ordered that Plaintiff's opposition to the Motion to Dismiss be filed on May 14, 2008. (Doc. No. 19.)

3. Defendant's Motion to Dismiss claims that the Dyson Agreement has been superseded by a "Vendor Agreement" signed by LNT Merchandising Company, LLC, in March 2006, and by Dyson in May 2006, which provides for venue in New Jersey.

4. Dyson disputes that the "Vendor Agreement" has ever been agreed to, signed, executed or performed by Dyson, and will demonstrate in opposition to the Motion to Dismiss that Dyson has never signed, electronically or otherwise, the Vendor Agreement. (The "Vendor Agreement," attached hereto as Exhibit B.)

5. Defendant's Motion to Dismiss is premised in large part on the claim that Dyson has signed the Vendor Agreement, and that the Vendor Agreement affects both substantive and procedural aspects of this litigation including, Defendant's counterclaims, the computation of damages, choice of law and venue. The controlling contract, however, is the Dyson Agreement, and its terms negate most, if not all, of Defendant's counterclaims, while allowing for venue to remain in the Northern District of Illinois.

6. Determining whether the Dyson Agreement or the Vendor Agreement controls will have a material impact on the Court's consideration of the Defendant's Motion to Dismiss. Therefore, Plaintiff requests that the Court allow a short time for discovery on this issue prior to filing its opposition to the Motion to Dismiss. Specifically, Plaintiff requests that it be granted until June 30, 2008, to file its opposition and that Defendant's reply be due by July 14, 2008.

7. The discovery requested will not prove to be cumulative or unnecessary following ruling on Defendant's Motion to Dismiss as the discovery sought pertains to the core issues of the case and will be utilized whether it remains before this Court or is transferred to

another District Court. No party will be unduly prejudiced by this request, nor will this request affect any of the proposed discovery deadlines set forth in the parties' Joint Status Report.

WHEREFORE, for the foregoing reasons, Plaintiff, Dyson, Inc., respectfully requests that the Court set the following briefing schedule on the Motion to Dismiss to allow the Plaintiff limited discovery on the purported signing of the Vendor Agreement: Plaintiff's opposition is due on June 30, 2008, and Defendant's reply is due by July 14, 2008.

Dated: April 30, 2008

/s/ Caroline C. Plater
One of the Attorneys for Plaintiff,
DYSON, INC.

Henry T. Kelly, #6196301
Caroline C. Plater, #6256076
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070

# Exhibit A

DYSON, INC
520 N. Erie, Suite 410
Chicago, IL 60610
Phone: (312) 469-5950   Fax: (312) 469-5952

Attn: Julie
From: Bill Nadel



Form FC:A03
General Conditions of Sale

1 April 1999

1. DEFINITIONS
   In these Conditions the following expressions shall have the following meanings:-
   The Seller      Dyson Inc.
   The Buyer       The person, firm or company, referred to as "the Buyer" in the Seller's Acknowledgement of Order form
   The Goods       The Goods described in the Seller's Acknowledgement of Order form
   The Contract    The Contract for the sale of the Goods by the Seller to the Buyer
   Particulars of  The particulars of the Contract set out on the face of the Seller's
   Contract        Acknowledgement of Order form.

2. CONSTRUCTION OF CONTRACT
   (1) These Conditions shall apply to all contracts of sale (and to any ancillary services) between the Seller and the Buyer.
   (2) The terms of the Contract shall consist of the Particulars of Contract and these Conditions of Sale. These Conditions shall be construed subject to the Particulars of Contract.
   (3) No other terms contained in any document issued by either party or in any written or oral communication between the parties shall apply to the Contract nor shall these Conditions or the Particulars of Contract be modified without the written agreement of the Seller on or after the date of the Seller's Acknowledgement of Order.
   (4) In order that the Contract shall be a complete statement of the understanding between the parties with regard to the sale of the Goods, the Buyer must ensure that any pre-contractual representation on which it wishes to rely has been specified in the Particulars of Contract. In entering into the Contract, the Buyer does not rely upon any such representation made by or on behalf of the Seller which has not been so specified.
   (5) Descriptions and illustrations of the Goods submitted with any quotation or contained in any brochure or catalogue are only a general representation of the Goods and are not intended to be reliable with regard to details, as design modifications and improvements may be introduced.

3. QUOTATIONS AND ORDERS
   (1) Unless accepted before lapse or withdrawal, quotations made by the Seller shall automatically lapse after seven days, but may be withdrawn earlier.
   (2) All orders placed by the Buyer on the Seller shall be subject to these Conditions of Sale.
   (3) There shall be no binding contract until the Seller has accepted the Buyer's order by sending to the Buyer an Acknowledgement of Order form. No employee or agent of the Seller has authority to contract in any other manner.

4. DELIVERY
   (1) Delivery shall take place when the Goods are unloaded at or delivered to the Buyer's premises or other delivery location specified in the Contract, except that if the Buyer collects or arranges collection of the Goods from the Seller's premises, or nominates a carrier for the Goods, delivery shall take place when the Goods are loaded onto the collection or carrier's vehicle.
   (2) The Seller will endeavor to complete delivery on or before any delivery dates requested by the Buyer or estimated by the Seller but the Seller will not be liable for any delay in delivery.
   (3) The quantity of Goods delivered under the Contract shall be recorded by the Seller upon dispatch from the Seller's factory or warehouse and the Seller's record shall be accepted by the Buyer as conclusive evidence of the quantity delivered. It is the Buyer's responsibility to notify the Seller if the Goods have not been received within five days of the receipt of the Seller's invoice therefore. If no notification is made the Buyer shall be deemed to have received the Goods.
   (4) The Seller shall be entitled to deliver the Goods by installments and to invoice each installment separately.
   (5) The delivery of a greater or lesser quantity of the Goods than the quantity provided for in the Contract, the delivery of other goods not provided for in the Contract, or the delivery of Goods only some of which are defective, shall not entitle the Buyer to reject all the Goods delivered or to terminate the Contract in whole or in part nor shall any incorrect delivery or defect in respect of one or more installments entitle the Buyer to terminate the Contract or subsequent installments. Any claim in respect of error in quantity or type of Goods or in respect of the condition of Goods delivered must be made in writing to the Seller within five working days of receipt by the Buyer.

If the Seller arranges to arrange carriage or insurance on behalf of the Buyer, all charges and expenses in connection therewith shall be invoiced to the Buyer and paid within the period specified in Condition 9(1). The Seller shall not be liable for its suitability of the terms of any such carriage or the adequacy of any such insurance and sub-sections (2) and (3) of Section 35 of the Sale of Goods Act 1923 shall not apply to the Contract.

5. PACKING
Packaging for the Goods shall be at the discretion of the Seller which shall have the right to pack the Goods in such manner and with such material and in such quantities as it, in its absolute discretion, thinks fit, unless detailed packaging instructions are received and agreed by the Seller prior to agreeing a price for the Goods and are then incorporated into the Contract.

6. EXAMINATION AND CLAIMS
The Buyer shall upon delivery examine the Goods and shall promptly (but in any event within five working days of delivery) notify in writing the Seller (and the carrier, where relevant) of any apparent damage, defect or error in quantity or type of goods delivered. The Buyer shall comply with the carrier's rules, regulations and requirements so as, when appropriate, to enable the Seller to make a claim against the carrier in respect of any loss or damage in transit. Claims in respect of damage, defects or error in quantity or type of goods delivered not apparent on examination upon delivery must be notified in writing to the Seller within fourteen days of the date of delivery.

7. PROPERTY AND RISK
(1) The risk in the Goods shall pass to the Buyer upon delivery in accordance with the Contract notwithstanding that such delivery may not be at the final destination.
(2) The property in the Goods shall remain the Seller until, and shall pass to the Buyer only when:
   (a) payment shall have been made in full for:
      (i) the Goods the subject of the Contract; and
      (ii) all other goods the subject of any other contract between the Seller and the Buyer which, at the time of payment of the full price of the Goods sold under this Contract, have been delivered to the Buyer but not paid for in full;
   (b) the Buyer sells the Goods to its customers by way of bona fide sale.
If payment for the Goods is overdue in whole or in part the Seller may (without prejudice to any of its other rights) recover or resell such of the Goods as are then still the Seller's property, or any of them, and may enter upon the Buyer's premises by its servants or agents for that purpose. Without prejudice to the provisions of clause 11 such payments shall become due immediately upon the occurrence of any of the events referred to in clause 11. Until the property in the Goods has passed to the Buyer, the Buyer shall store the Goods at its premises to which the Goods were consigned by the Seller, separately from goods belonging to the Buyer, and shall not remove any batch numbers or other identification, or any notices stating that they are the Seller's property. The Seller shall nevertheless be entitled at any time to pass the property in the Goods to the Buyer by giving the Buyer written notice to that effect. Without further consideration the Seller shall have the irrevocable authority of the Buyer to resell any Goods repossessed by the Seller pursuant hereto.

8. PRICES
(1) Unless otherwise stated in the Particulars of Contract, prices for the Goods shall be ex-works and shall be exclusive of carriage and insurance.
(2) Notwithstanding any quotation or any other statement as to price which may have been given in or in connection with the Contract the Contract price shall be the Seller's list price prevailing at the date of dispatch. Prior to dispatch of the Goods, the Seller shall notify the Buyer of any variation in the price between the date of the Seller's Acknowledgement of Order and the date of dispatch.

9. PAYMENT
(1) Unless an agreed credit period is specified in the Contract the Contract price is to be paid forthwith upon receipt of invoice.
(2) Payment shall be made direct to the Seller and the Seller's official receipt shall be the only acknowledged discharge of any debt. The Buyer shall not be entitled to withhold payment of any amount due to the Seller under the Contract by reason of any payment to a third party, credit, set-off, counter-claim, allegation of incorrect or defective goods, or for any other reason whatsoever which the Buyer may allege excuses him from performing his obligations under the Contract.
(3) The Seller shall be entitled to charge interest on any overdue sum at the rate of 5 per cent per annum above the prime lending rate for the time being of the Commonwealth Bank of Australia Limited from the due date until the date of actual payment. The Buyer shall also reimburse to the Seller any legal costs and debt collection agency's fees incurred by the Seller in recovering or attempting to recover overdue payments from the Buyer.

10. WARRANTIES AND EXEMPTIONS

Page 2 of 4

IN THE EVENT OF THE DELIVERY OF ARTICLES NOT ANSWERING TO THE CONTRACTUAL DESCRIPTION OR OF THE GOODS DEVELOPING, UNDER PROPER USE, ANY DEFECT DURING A PERIOD OF 24 MONTHS FROM THE DATE OF DELIVERYT TO THE BUYER, DUE TO DEFECTIVE MATERIALS OR WORKMANSHIP (OTHER THAN THE GOODS OR PACKAGING PRODUCED TO THE BUYER'S SPECIFICATION), THEN PROVIDED THAT THE BUYER IS NOT IN BREACH OF ANY OF ITS OBLIGATIONS TO THE SELLER UNDER THIS OR ANY OTHER CONTRACT, THE SELLER SHALL, AT ITW OWN EXPENSE, REPLACE OR REPAIR SUCH ARTICLES OR GOODS AS ARE INCORRECT OR DEFECTIVE SO AS TO REMEDY THE DEFECTS OR, AT THE SELLER'S OPTION, REFUND THE PURCHASE PRICE ATTRIBUTABLE TO THE INCORRECT OR DEFECTIVE ITEMS, EXCEPT WHERE SUCH DEFECTS ARE ATTRIBUTABLE TO ACCIDENT, FAIR WEAR AND TEAR OR ANY ACTION OMISSION

– OR –

NEGLECT OF THE BUYER OR ITS AGENT
THE BUYER MUST GIVE THE SELLER NOTICE OF ANY ALLEGED DEFECT AS SOON AS IT BECOMES APPARENT, AND SHALL (UNLESS OTHERWISE INSTRUCTED BY THE SELLER) RETAIN THE GOODS AT THE BUYER'S PREMISES FOR INSPECTION BY THE SELLER AND GIVE THE SELLER ADEQUATE FACILITIES TO INVESTIGATE THE COMPLAINT AT THE BUYER'S PREMISES. IF THE SELLER SO REQUESTS, THE BUYER SHALL AT ITS OWN EXPENSE RETURN THE DEFECTIVE GOODS OR PARTS TO THE SELLER PROVIDED THAT IF THE SELLER IS LIABLE TO REPLACE OR REPAIR SUCH DEFECTIVE GOODS OR PARTS PURSUANT HERETO THEN THE SELLER SHALL REIMBURSE THE BUYER'S RESONABLE CARRIAGE EXPENSES IN CONNECTION THEREWITH. IF THE BUYER SHALL RETURN TO THE SELLER ANY GOODS OR PARTS WHICH ARE NOT DEFECTIVE, THE BUYER SHALL PAY THE COMPANY' RESONABLE CHARGES FOR HANDLING, TESTING AND RETURNING SUCH ITEMS TO THE BUYER AS WELL AS ANY ASSOCIATED COSTS INCURRED BY THE SELLER.

11. INSOLVENCY AND DEFAULT
In the event of the Buyer becoming (or appearing to the Seller to be about to become) bankrupt or insolvent, ceasing or threatening to cease business, dying or going (or appearing to be the Seller to be about to go) into liquidation, suffering the appointment of a receiver, receiver and manager or voluntary administrator, failing to pay its debts as they become due, making any arrangement with creditors, failing to make any payment due hereunder or being in breach of any other term of the Contract the Seller shall be entitled, without prejudice to its other rights, to postpone delivery (both in respect of the Contract or series of Contracts in question and any other contracts with the Buyer) until such payment has been made or other breach rectified and; also (or as an alternative) to determine the Contract (any/or any other such contracts) and to recover payment for all deliveries already made (whether or not such payment is otherwise then due) and for the cost of materials and labour already expended for the purpose of future deliveries (less any allowance of the value thereof as utilised by the Seller for other purposes) and also to recover from the Buyer a sum equivalent to the Seller's loss of profit arising out of such determination.

12. PATENTS ETC.
(1) Where all or any of the packaging for the Goods is produced to the Buyer's specification, the Buyer shall indemnify the Seller against all actions, claims, costs, damages or losses arising from any infringement of registered design, trade mark, design right, copyright or any similar protection in respect of the packaging so produced.
(2) Any reference by the Seller to patents, design rights, copyrights, registered designs, trade marks, and analogous forms of protection shall not constitute a warranty of the validity thereof.

13. EXCLUSION OF DAMAGE
The law implies terms, conditions and warranties ("prescribed terms") into contracts for the supply of goods and services and prohibits the exclusion, restriction or modification of certain terms, conditions and warranties. Some prescribed terms permit a supplier to limit its liability for a breach of the prescribed terms. Except as provided by prescribed terms and to the fullest extent permitted by law:-
(1) The liability of the Seller in respect of a breach of a prescribed term relating to the products or any part thereof is limited at the option of the Seller to the replacement or repair of the products or any part thereof or payment of the cost of repairing or replacing the products or any part thereof;
(2) In these conditions the Buyer shall not under any circumstances have any cause of action against or right to claim or recover from the Seller for, or in respect of, any loss or damage of any kind whatsoever, caused directly or indirectly by any defect in material or workmanship of, or any other defect whatsoever in, or unsuitability for, any purpose of the products or any part thereof, or by default or negligence on the part of the Seller or of any servant, contractor or agent of the Seller relating to the supply of, or otherwise concerning the products or any part thereof.

---

Acceptance of above terms.
I/We accept the above terms and conditions of sale.

Signature *William Nadel* on behalf of (Company Name) Linens N Things

Name (please print) William Nadel   Date 9/16/03

*[signature]* President
10/29/04

# Exhibit B

# VENDOR AGREEMENT FOR "LINENS 'N THINGS"

This Vendor Agreement, dated as of 3/20/2006 , (hereinafter "Vendor Agreement") is entered into by and between LNT Merchandising Company, a Delaware limited liability company, with its principal place of business located at 6 Brighton Road, Clifton, NJ (hereinafter, together with its affiliates, "LNT") and:

DYSON INCORPORATED
(Name of Vendor)

600 WEST CHICAGO AVE.,S
(Address of Vendor)

IL
(State or Jurisdiction of Incorporation)

hereinafter referred to as "Vendor." Vendor must supply the additional information requested on the attached VENDOR PROFILE FORM. The VENDOR PROFILE FORM is a part of this Vendor Agreement. Both LNT and the Vendor may be referred to herein separately as "Party" or together as the "Parties."

1. Appointment of Vendor: LNT hereby designates Vendor as an approved non-exclusive supplier of merchandise. LNT may from time to time, in its sole discretion, place orders for the purchase of merchandise with Vendor. Nothing in this Vendor Agreement obligates LNT to transact any business with Vendor. LNT and Vendor expressly acknowledge that no partnership, joint venture or agency relationship is intended or created by reason of this Vendor Agreement.

2. Term of Agreement: This Vendor Agreement will remain in effect until terminated by either Party. Except as set forth below in this paragraph 2, this Vendor Agreement may be terminated at will by either Party, in writing, with or without cause. However, in the event this Vendor Agreement is terminated, Vendor agrees to satisfy all pending purchase orders for merchandise placed by LNT unless otherwise notified by LNT. Termination of this Vendor Agreement will not affect the respective rights and obligations of the Parties with respect to any merchandise theretofore ordered (subject to Vendor's obligations and LNT rights under the preceding sentence) or purchased pursuant to this Vendor Agreement. In the event this Vendor Agreement is terminated and Vendor's account with LNT has a debit balance, the Parties agree that LNT shall have the right, in addition to all other rights and remedies of LNT, to chargeback such debit balance against any outstanding Vendor invoices. Termination shall not limit LNT's right to collect any amounts owed by Vendor. In the event Vendor is on a replenishment program, Vendor may only terminate this Agreement upon one hundred twenty (120) days prior written notice to LNT. LNT shall have the option of accepting such termination prior to the end of said one hundred twenty (120) day period. In the event Vendor fails to give said one hundred twenty (120) days prior written notice, Vendor agrees that Vendor shall be liable for LNT's transition costs.

3. Terms of Purchase/Sale Transactions: The terms of any purchase/sale transaction between the Parties are exclusively set forth herein, and in any purchase order issued by LNT, notwithstanding any contrary or additional terms contained in any invoice, statement or other communication from Vendor. The terms of any purchase/sale transaction as set forth herein or in any such LNT purchase order may only be modified in a writing containing the signature of an authorized representative of LNT.

4. Preticketing and Barcoding: Vendor agrees to preticket and bar code, with a correct UPC and LNT specified retail price, all merchandise sold to LNT, and to otherwise comply with all requirements of LNT's then current VENDOR MANUAL, which is incorporated into and made a part of this Vendor

Agreement by reference. Vendor understands and agrees that LNT's transportation, logistics, and inventory systems demand strict compliance with these requirements. Vendor will be assessed a chargeback to Vendor, which in LNT's discretion may be taken in the form of a credit against amounts payable to Vendor, in amounts either set forth in the VENDOR MANUAL or, if of a type or severity not set forth in the guide, as otherwise established by LNT, in order to compensate LNT for any failure to comply with the requirements of LNT's VENDOR MANUAL. LNT reserves the right to amend its VENDOR MANUAL from time to time and any such modification shall apply to all purchase orders made by LNT beginning ten (10) days following the effective date of such modification. LNT's form of VENDOR MANUAL, as then in effect, is available to all authorized Vendors by accessing the same from LNT's website, or otherwise upon request to LNT. Upon LNT's request, Vendor agrees, at Vendor's expense, to pre-tag all merchandise with electronic article surveillance sensor tags, provided by an LNT-approved supplier.

5. Electronic Data Interchange (EDI): LNT requires that Vendor be EDI capable in order to facilitate the exchange of information with Vendor. In the event Vendor is not EDI capable, LNT may charge Vendor a per invoice charge. The amount charged for each such invoice shall be outlined within LNT's VENDOR MANUAL and is subject to change from time to time, effective ten (10) days following the date of such change. In addition, the Parties acknowledge and agree that the execution and delivery of this Vendor Agreement by the Parties may be by electronic means, and all purchase orders issued hereunder may be placed and accepted by electronic means, and, as such, shall be considered valid and enforceable signed writings.

6. Payment Terms: Except as otherwise provided in a writing signed by LNT, payment by LNT for merchandise purchased from Vendor will be rendered on a net sixty (60) day basis from LNT's receipt of the bill or invoice from Vendor.

7. Damage Expense Offset: A Damage Expense Offset (the "Damage Expense Offset") in the amount equal to the greater of (i) 2% of gross receipts of merchandise purchased, or (ii) the Damage Expense Offset set forth in the Vendor Profile Form for Vendor, will be deducted monthly from all accounts payable to Vendor to offset damages incurred during the period in which merchandise from the Vendor was purchased by LNT. LNT may elect to reconcile Vendor's account within a reasonable time after the end of each fiscal year of LNT during the Term hereof to determine if damage was in excess of the Damage Expense Offset amount then in effect for Vendor. If damages during the annual period are determined to be in excess of the Damage Expense Offset in effect for Vendor, Vendor shall be subject to chargebacks for the excess and LNT may also increase the Damage Expense Offset in the Vendor Profile Form. If damage is determined to be less than the Damage Expense Offset in effect for Vendor, Vendor shall nevertheless be subject to at least the established Damage Expense Offset applicable to the Vendor. In the event that merchandise is returned to Vendor, for any reason, LNT shall retain the Damage Expense Offset. Salvage rights to all damaged merchandise shall belong to LNT.

8. Shipping: Vendor understands the critical nature of shipping merchandise in a timely and conforming manner and acknowledges that LNT may suffer monetary losses and/or loss of customer goodwill in the event Vendor fails to strictly comply with LNT's shipping requirements. Vendor, at Vendor's cost and expense, agrees to pay for the transport of merchandise from Vendor's sources to LNT's final distribution point. To the extent that it is applicable to the method of shipping elected by Vendor, Vendor agrees to comply with the requirements of LNT's then current VENDOR MANUAL which is incorporated into and made a part hereof by reference. LNT reserves the right to amend its VENDOR MANUAL from time to time, and any such modification shall apply to all purchase orders made by LNT, effective ten (10) days following the date of such modification. LNT's form of VENDOR MANUAL is available to all authorized Vendors by accessing the same from LNT's website or otherwise upon request to LNT. Vendor hereby agrees to ship to LNT according to the terms elected in the Vendor Profile Form. An inbound Freight Expense Offset (the "Freight Expense Offset") in an amount equal to the greater of (i) 2.6% of gross receipts of merchandise purchased, or (ii) the Inbound freight Expense Offset set forth in the Vendor Profile Form for Vendor will be deducted monthly from all accounts payable to Vendor to offset freight costs incurred during the period in which merchandise from the Vendor was purchased by LNT. LNT may elect to reconcile Vendor's inbound freight account twice a year, during the Term hereof, to determine if inbound freight cost(s) are in

excess of the Freight Expense Offset amount then in effect for Vendor. If inbound freight expenses are determined to be in excess of the Freight Expense Offset in effect for Vendor, Vendor shall be subject to a chargeback for the excess, and LNT may also increase the Freight Expense Offset in the Vendor Profile Form to account for the difference. If inbound freight is determined to be less than the Freight Expense Offset then in effect for Vendor, LNT agrees to make Vendor subject to this lower rate for the future transport of merchandise;. Notwithstanding anything above to the contrary, in the event that merchandise is returned to Vendor by LNT, for any reason, LNT shall retain the Freight Expense Offset in effect at the time such merchandise was shipped.

9. New Store Terms/New Business Terms/Expense Offset: Payment by LNT for orders designated as New Store orders (which term includes orders designed to stock and re-stock New Stores within thirty (30) days of a New Store opening) will be rendered on a net ninety (90) day basis. In addition, Vendor agrees to a ten percent (10%) discount (herein "New Store/Business Expense Offset"), which will be deducted by LNT when paying related invoices. LNT requires that any merchandise ordered for a New Store/Business shall be shipped complete between the ship dates and cancel dates set forth in the purchase order. Vendor understands and agrees that strict compliance with this requirement is critical to LNT for the successful opening and initial operation of a New Store/Business. Due to the critical nature of New Store/Business openings, Vendor agrees to be subject to a minimum chargeback of twenty-five percent (25%) of the entire cost of the purchase order for any order shipped after the cancel date and/or received by LNT less than ninety-five percent (95%) complete, such chargeback not to exceed the value of the merchandise ordered by LNT. In addition, LNT shall have the right, at Vendor's expense, to expedite late arriving merchandise to New Store/Business location(s) or require Vendor to ship directly to any New Store/Business location(s).

10. Marketing: To support the selling costs incurred by LNT on behalf of the Vendor, Expense Offsets are provided by Vendor to LNT in connection with LNT's selling costs (markdowns and advertising expenses) for Vendor's merchandise and Vendor agrees to the "Direct Cost Expense Offsets" set forth on the Vendor Profile Form. Notwithstanding the foregoing, LNT and Vendor may mutually agree on additional selling Expense Offsets from Vendor from time to time over and above the Direct Cost Expense Offsets set forth on the Vendor Profile Form. The Vendor has the right to obtain support for the calculation of the Direct Cost Expense Offsets by LNT, as based on the stated Expense Offset percentage applied against LNT's cost of the merchandise purchased by LNT from Vendor during the Term; provided that the good faith determination by LNT will be final and binding on the Parties, absent any manifest error.

11. New, Test, Seasonal, Promotional, and Replenishment Product/Orders [Two Date Orders]: (a) LNT orders for new, test, seasonal, promotional and/or replenishment merchandise shall display two dates: a ship date and a cancel date. Vendor shall have forty-eight (48) hours from the time of receiving the order for such new, test, seasonal, promotional, or replenishment merchandise to respond to LNT, in writing, with any necessary proposed adjustment to the order, subject to LNT's written acceptance of any such proposed adjustment to the order. If Vendor fails to respond within said forty-eight (48) hours, LNT shall consider such order a firm agreement by Vendor. LNT will issue groups of orders to Vendor on the same day, for the same product. These like orders sent by LNT to Vendor, on that same day, may have different destinations and ship dates but the total set of orders (as a whole) shall be referred to as the "LNT Commitment" to purchase from Vendor. Vendor understands and agrees that strict compliance in satisfying the entire LNT Commitment, including shipment within time sensitive ship dates and cancel dates, is critical to the successful sale and promotion of such merchandise ordered by LNT. If a LNT Commitment (the full set of like orders) is (i) shipped after the cancel date specified in the orders, (ii) not shipped, and/or (iii) shipped less than ninety-five percent (95%) complete in the aggregate, Vendor agrees to be subject to a minimum chargeback of ten percent (10%) of the cost of the entire LNT Commitment (a complete schedule of "Off-set Expenses" is documented in the VENDOR MANUAL). In addition, LNT shall have the right, at Vendor's expense, to expedite late arriving merchandise to LNT's store locations, or, upon LNT's request, require Vendor to ship directly to stores.
   (b) LNT reserves the right to cancel any purchase order, LNT Commitment, or the remaining balance of any purchase order or LNT Commitment not shipped within the definitive timing rules set forth in VENDOR MANAUL.
   (c) To support the assessment, or purchase and promotion of new or existing merchandise to be sold by LNT, Vendor agrees to abide by all the standards set forth in the VENDOR MANUAL, at no

cost to LNT, when providing the following materials, and as defined in the VENDOR MANUAL: (i) Product Samples, (ii) Accurate Product Attributes and Dimensions, (iii) Digital Photography of Product, (iv) Proof Global Social compliance, and (v) a Link between all Vendor web sites that do not offer merchandise for sale, and any LNT web site created for the sale of merchandise.

12. Notice Required: In the event Vendor disputes any (i) chargeback(s), or (ii) Expense Offset(s), or (iii) other deduction or credit taken by LNT in connection with LNT's VENDOR MANUAL, or (iv) the terms of this Vendor Agreement (including the Vendor Profile Form), Vendor shall notify LNT of such dispute in writing (together with all of Vendor's detailed information supporting each disputed item) via hand delivery, certified mail, courier service or facsimile transmission, within one hundred twenty (120) days of the date on which such chargeback(s), Expense Offset(s) or other deduction or credit appears on a check stub/LNT remittance advice, or other written communication to Vendor or its duly authorized agent. Strict compliance with this notice procedure is acknowledged by Vendor to be important in resolving any claims of disputed items, and Vendor hereby agrees to waive and release any claim for any chargeback(s), Expense Offset(s) or other deduction or credit for which Vendor has failed to provide the notice and supporting information as required above.

13. Indemnification: Vendor shall indemnify, defend and hold harmless LNT, its affiliates and each of their respective officers, directors, employees and agents from and against any and all claims, obligations, liabilities, actions, damages, losses, costs and expenses (including reasonable fees and costs of legal counsel chosen by LNT) and other expenses arising out of or related to: (i) any claimed or alleged defect in any merchandise sold by, on behalf of, or through Vendor to LNT, or (ii) any act or omission of Vendor in breach or violation of this Vendor Agreement, or any breach of or inaccuracy in any representation or warranty of Vendor, or (iii) any claimed or alleged violation or infringement by Vendor of any other contract, law or legal requirement, or (iv) any claim or allegation that any merchandise sold by, on behalf of, or through Vendor to LNT violates, infringes or interferes with any intellectual property right or other proprietary right of any third party (including any claimed patent, trademark, trade name, service mark or other intellectual property right). Vendor shall not settle any indemnified claim without LNT's approval, and in no event shall any such settlement involve or require any payment or obligation by LNT. Without limiting any other terms or conditions of the paragraphs in this Vendor Agreement (including paragraph 2 above), the respective rights and obligations of the Parties under this paragraph 13 shall survive any termination of this Vendor Agreement.

14. Compliance with Applicable Laws, and Other LNT Matters: With respect to the manufacture, sale, and/or import of merchandise sold by, on behalf of, or through Vendor to LNT, Vendor agrees and hereby certifies that Vendor shall ensure strict compliance with all applicable laws and regulations, including those of the United States, and those of any foreign country in which the merchandise is manufactured, or from or through which it is exported or imported (including, without limitation, labor laws and duty, import and export laws and restrictions). In no event shall the manufacture of any such merchandise involve child or forced labor, as detailed in LNT's Manufacturer's Code of Conduct. Vendor also agrees at all times to strictly comply with LNT's established VENDOR MANUAL, LNT's Compliance Program Guidelines and Factory Monitoring Expectations (inclusive of LNT's Manufacturing Code of Conduct), and other terms and conditions of the manufacture of merchandise and its sale to LNT, as each of the foregoing documents may be in effect from time to time, and which can be found by accessing www.LNT.com under the link to Vendor Services.

15. Intellectual Property: (a) Vendor represents and warrants that no merchandise or goods sold by, on behalf of, or through Vendor to LNT (including any designs or methods for any such merchandise or goods and including any merchandise or goods specifically manufactured for LNT as private label merchandise) violates, infringes or interferes with any intellectual property right or other proprietary right of any third party (including any claimed patent, trademark, trade name, service mark or other intellectual property right); and (b) except as expressly set forth in any purchase order issued by LNT, Vendor (i) shall have no right to use any LNT trademarks or trade names for any purpose, (ii) shall not register any LNT trademark or product designation in any jurisdiction for any reason, , (iii) shall not make any item developed (which term shall include any guidance or assistance from LNT regarding a new/improved/different product design, functionality, composition, texture, or color) in

conjunction with, or at the direction of LNT, available to any other outlet or retailer, as this product shall remain the sole property of LNT, and (iv) shall not make any item commissioned or ordered by LNT available for sale via the Internet. Vendor shall not incorporate any LNT trademark or trade name into any domain name or meta tag on any web site operated directly or indirectly by Vendor, unless expressly approved by LNT in writing.

16. Governing Law, Jurisdiction, Venue and Attorneys' Fees: This Vendor Agreement is entered into in, and shall be governed by and construed under the laws of, the State of New Jersey. The federal and state courts within the State of New Jersey shall have exclusive jurisdiction to adjudicate any dispute arising out of or related to this Vendor Agreement. Vendor hereby expressly consents to (1) the personal jurisdiction of the federal and state courts within the State of New Jersey, and (2) service of process being effected upon it by registered mail sent to the address set forth at the beginning of this Vendor Agreement. In the event of any litigation or other legal action or proceeding between the Parties which arises out of or is related to this Vendor Agreement, the non-prevailing Party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing Party in connection with such litigation, action or proceeding.

17. Disclosure of Confidential Information: Each Party shall hold in confidence and shall not disclose to any third party the other Party's proprietary or confidential information ("Confidential Information") disclosed to it by the other Party, except as expressly permitted under this Vendor Agreement. The Parties shall use such Confidential Information only for the purpose for which it was disclosed and shall not exploit such Confidential Information for its own benefit or the benefit of another without the prior written consent of the disclosing Party. Each Party shall disclose Confidential Information of the other Party only to its employees and consultants who have a need to know such Confidential Information in the course of the performance of their duties and who are legally bound to protect the confidentiality of such Confidential Information: In the case of such consultants, the Party shall obtain a written agreement substantially similar to this Vendor Agreement and, in the case of such employees, the Party shall obtain a written acknowledgment of the confidentiality.

18. Proprietary Products: Vendor may not sell merchandise with the Linens 'n Things and/or LNT trademark and service mark (or any other trade name, trademark or service mark of LNT) to a party other than LNT, except only with the written approval from LNT prior to the sale of such merchandise. In such event (i) all price tickets shall be removed, (ii) all labels denoting the merchandise as "Irregulars" or "Seconds" shall be prominently placed on the product, and (iii) Vendor shall insure such merchandise is not sold in locations that directly compete with an LNT trade area and, in all events, such merchandise shall be distributed outside the New York/New Jersey trade area.

19. Miscellaneous:
(a) This Vendor Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof and supersedes all prior agreements, both oral and written, between them as those agreements may relate to the subject matter of this Vendor Agreement. This Vendor Agreement may be changed only by a written agreement signed (which may be by electronic signature) by the Parties or their authorized representatives.
(b) The rights and obligations under this Vendor Agreement may not be assigned by Vendor without the express written consent of LNT. LNT shall have the right to assign its rights under this Vendor Agreement.
(c) This Vendor Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.
(d) If any term or provision of this Vendor Agreement is held by a court or other tribunal of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms and provisions of this Vendor Agreement shall remain in full force and effect, and shall in no way be affected, impaired or invalidated.
(e) The headings used in this Vendor Agreement are for convenience only and are not to be considered in connection with the interpretation or construction of this Vendor Agreement.
(f) EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS VENDOR AGREEMENT, ANY OF THE RELATED DOCUMENTS, OR ANY TRANSACTIONS

CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

IN WITNESS WHEREOF, LNT and Vendor have caused this Agreement to be duly executed and delivered in their respective names and which will be in effect as of _____, 2006.

| LNT MERCHANDISING COMPANY, a Delaware limited liability company | | Vendor Name: | DYSON INCORPORAT |
|---|---|---|---|
| Name: | BILL NADEL | Name: | Thomas Lawler |
| Title: | | Title: | National Acct. Mgr. |
| Date: | 3/20/2006 | Date: | 5/15/2006 |

Next >>

## VENDOR PROFILE

| | | |
|---|---|---|
| ○ Vendor Change | Vendor AP #: 18156 | Currency For Payment: |
| ○ New Vendor | Vendor UPC #: | Entered A/P On: |
| | Dep't: VACUUMS AND IRON | By: |

This agreement has been approved by: SILVER

Vendor Name: DYSON INCORPORATED

| | | | |
|---|---|---|---|
| Corporate Name: | DYSON INCORPORATED | Shipping/Logistics Contact: | EMILY EVANS - 312-7 |
| Corporate Address: | 600 WEST CHICAGO AVE., SUITE 275 CHICAGO | Title: | 8 |
| DUNS #: | DUNS# 119523277 | Address: | |
| Phone #: | 8666939766 | | |
| Fax #: | 13124695951 | Phone #: | |
| 800 #: | | Fax #: | |
| | | Email Address: | tom.lawler@dyson.com |
| NAFTA Contact: | | Return Goods Address: | SONWIL DISTRIBUTION CENTER |
| Phone #: | | | |
| Email Address: | | Phone #: | 0 |
| | | Fax #: | 7168530121 |
| Remittance Name: | DYSON INCORPORATED | Email Address: | |
| Remittance Address: | 520 W ERIE ST. SUITE 410 | Blanket RA #: | |
| Phone #: | 8666939766 | Origin Addresses of freight being shipped: | |
| Fax #: | 3124695951 | | |
| 800 #: | | | |
| Factor Name: | | Hours of Operation: | to |

| Factor Address: | | Operations Contact: | |
| --- | --- | --- | --- |
| | | Phone #: | |
| EDI Contact Name: | - EMILY EVANS - 312- | Email Address: | |
| Phone #: | | | |
| Fax #: | | Add'l Approved Freight Shipping Point: | |
| Email Address: | emily.evans@dyson.com | Hours of Operation: | to |
| | | Operations Contact: | |
| Sales Contact Name: | C/O MAUREEN MORIARTY | Phone #: | |
| Address: | 175 KENSINGTON ROAD | Email Address: | |
| Phone #: | 3125456160 | | |
| Fax #: | 2016348617 | | |
| Email Address: | Maureen.Moriarty@dyson.com | | |

Website Administrator Contact Name:  
Phone #:  
Email Address:

| | | | |
| --- | --- | --- | --- |
| ASN Capable? | ○ Yes  ○ No | If no, future date: | |
| EDI Capable? | ⊙ Yes  ○ No | If no, future date: | |
| UCC 128 labeling: | ⊙ Yes  ○ No | If no, future date: | |
| Internet capable? | ○ Yes  ○ No | If no, future date: | |
| Internet E-Mail Address: | ○ Yes  ○ No | If no, future date: | |

Payment Terms: NET 50 DAYS          New Store Terms: 10% & 30 EXTRA DAY

METHOD OF PAYMENT: Check if Vendor participates in LNT Accelerated Payment Program:
○ Yes  ⊙ No

Damage Expense Offset:  0   % Of Gross Receipts

Shipping Terms:
Merchandise Terms (Choose One).

- ⦿ FOB Origin
- ○ FOB Destination

Vendor hereby elects to ship to LNT on the following basis (Choose One):

⦿ [2] % of gross receipts to be deducted monthly from any accounts payable to Vendor as Freight Expense Offset to fund the cost of transporting merchandise from Vendor to LNT.

○ Vendor agrees to pay all shipping freight charges directly.

<u>Other Terms</u>: Check if applicable:

☑ Expense Offsets to cover the following costs incurred by LNT on behalf of the Vendor: Markdowns and Advertising Expenses (these Expense Offsets are referred to as the "Direct Cost Expense Offsets"):
[4] % of cost of merchandise purchased by LNT from Vendor during the period, deducted monthly

☐ If cost of merchandise purchased by LNT from Vendor during [ ] (period) are equal to or greater than:

[ ] Vendor Expense Offsets to LNT [ ] % of cost of merchandise purchased by LNT from Vendor

[ ] Vendor Expense Offsets to LNT [ ] % of cost of merchandise purchased by LNT from Vendor

[ ] Vendor Expense Offsets to LNT [ ] % of cost of merchandise purchased by LNT from Vendor

[ ] Vendor Expense Offsets to LNT [ ] % of cost of merchandise purchased by LNT from Vendor

[ ] Vendor Expense Offsets to LNT [ ] % of cost of merchandise purchased by LNT from Vendor

[ ] Vendor Expense Offsets to LNT [ ] % of cost of merchandise purchased by LNT from Vendor

| LNT Buyer: | BILL NADEL | Vendor Email: | |
| Buyer Phone: | 973-778-1300 | | |

03-13-2008   15:04   From-                                            T-163   P.011/011   F-214

| Buyer Fax:    | 973-778-3085    |
|---------------|-----------------|
| Buyer E-Mail: | BNADEL @lnt.com |

The above has been agreed to by:

| Authorized Vendor Rep Name | Linens 'n Things Name |
|---|---|
| Thomas Lawler | BILL NADEL |
| Authorized Vendor Rep Title | Linens 'n Things Title |
| National Acct. Mgr. | |
| Date of Signature | Date of Signature |
| 5/15/2006 8:04:51 AM | 3/20/2006 |

**Return to Agreements Page**